**OVERNITE TRANSPORTATION COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**International Brotherhood of Teamsters, Local 728, Intervenor.**

No. 97–1387.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1998.

Decided April 7, 1998.

John N. Raudabaugh argued the cause for petitioner, with whom Christopher A. Johlie and Kenneth F. Sparks, Chicago, IL, were on the briefs.

Jill A. Griffin, Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda Sher, Associate General Counsel, South Euclid, OH, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick L. Cornnell, Jr., Supervisory Attorney, Alexandria, VA, were on the brief.

James D. Fagan, Jr., and Robert S. Giolito, Atlanta, GA, were on the brief for intervenor International Brotherhood of Teamsters, Local 728.

Before: WALD, SILBERMAN and ROGERS, Circuit Judges.

WALD, Circuit Judge:

This dispute arose out of a union election conducted at the Atlanta Service Center of Overnite Transportation Company ("Overnite") on April 17, 1995, by the National Labor Relations Board ("NLRB" or "Board"). The International Brotherhood of Teamsters, Local 728 ("union") won the election by a wide margin. Nonetheless, Overnite refused to bargain with the union on the grounds that the union had engaged in unlawful pre-election and election day video and photographic surveillance of employees and unlawful electioneering, thereby destroying the conditions required for a free and fair election. In Overnite's final appeal before the Board, the Board granted the NLRB's motion for summary judgment, holding that the union was the properly elected bargaining agent for employees at Overnite's Atlanta facility and that Overnite violated sections 8(a)(1) and (5) of the National Labor Relations Act ("Act") when it refused to bargain with the union. Overnite filed a petition for review with this court, arguing for a remand to the Board with instructions to decide the case in light of its forthcoming decision in two consolidated cases, *Flamingo Hilton–Reno*, Case No. 32–CA–14378 and *Randell Warehouse of Arizona, Inc.*, Case No. 28–RC–5274, which Overnite claims address issues substantially similar to the case at hand. Alternatively, Overnite asks this court to deny enforcement of the Board's order, thus permitting a new election. We hold that the pre-election and election day videotaping and photographing of Overnite employees did not constitute unlawful surveillance sufficient to invalidate the union election, that there was no unlawful electioneering by the union, and that the Board reasonably refused to delay certification of the union. Accordingly, we deny Overnite's petition for review and grant the Board's cross-petition for enforcement.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Overnite points to four separate instances in which it argues agents of the union engaged in impermissible conduct. The first incident occurred approximately two weeks before the election. John Blow, an Overnite employee, attended a meeting at Local 728's union hall. Blow, who was procompany, testified that he saw Local 728's Secretary videotaping employees as they left the union hall. *See* Transcript at 377–79, 405–06 (May 9, 1996) (testimony of John Blow). He also testified that no one explained why the Secretary was videotaping the attendees. *See id.* at 378.

A second incident occurred on Tuesday, April 11. Employee Parker Roberts testified that Overnite President Jim Douglas and Overnite Vice President Paul Heaton visited the Atlanta Service Center. *See* Transcript at 466–67 (May 9, 1996) (testimony of Parker Roberts). During the visit, union supporters took photographs of Douglas, Heaton, and employees with whom they spoke, including Roberts. *See id.* at 467. Roberts testified that he believed that the photographs would be used to intimidate employees who supported the company. *See id.* at 467–68.

A third incident occurred in the late afternoon and early evening of Friday, April 14, 1995. Three employees testified that when

they arrived for work at the Atlanta facility, they saw a crowd of union supporters gathered in the driveway area, a few of whom were taking pictures and one of whom was using a videocamera. That same day, several employees gathered in the break room of Overnite's Atlanta facility to discuss an upcoming union election. After a "heated argument," employee Dennis McConley, a member of the Union Organizing Committee who had actively campaigned for the union and who was later elected a union steward, left the break room and returned with a video camera. McConley did not explain the purpose of the videotaping, and there is no evidence that anyone asked why he was videotaping. Two pro-company employees, John Sibley and Tim Carter, left the room soon after McConley entered with the videocamera because they were concerned that the videotape would be used to retaliate against them for taking an anti-Teamster position. *See* Transcript at 273–79 (May 9, 1996) (testimony of John Sibley); Transcript at 518–23 (May 9, 1996) (testimony of Tim Carter).

Finally, Overnite claims that on the day of the union election, there was a crowd of about 100 union supporters, including International Organizer Keith Maddox, Teamster President Ron Carey, and the President of Local 728, gathered in the facility's driveway area. *See* Brief of the Petitioner at 13–14. Overnite charges that employees were subjected to intimidation, coercion, surveillance, and electioneering by a group of supporters who held a "raucous" rally within earshot of the polling station and within sight of employees waiting to vote. *See id.* at 14–15. Members of the pro-union crowd were seen taking videos and photographs, while Maddox was present. *See id.* at 16–17. At least one employee was concerned that the union would use the video and photographs to retaliate against pro-company employees. *See id.* at 17. At no time, Overnite argues, did the union provide an explanation to employees for the videotaping and photography. *See id.* at 18.

In the April 17, 1995 election, 136 employees voted for union representation, and 100 voted against; there were only four chal-

lenged ballots. *See* Tally of Ballots at Joint Appendix ("J.A.") 6–7. Overnite filed 12 objections to the election. *See* Employer's Objections to Conduct Affecting the Results of the Election (April 22, 1995). The objections included allegations that the union had engaged in unlawful surveillance, coercion, intimidation, and harassment by videotaping employees known to be company supporters in the break room on April 14, 1995 (Objection 1), had engaged in similar conduct on election day by photographing employees as they entered and exited the company's premises (Objection 4), and had engaged in unlawful electioneering within the no-electioneering zone (Objection 5). *See id.* The Regional Director conducted an administrative investigation of the objections pursuant to which he issued a Supplemental Decision and Certification of Representative overruling all of the objections and certifying the union as the employees' collective-bargaining representative. Soon thereafter, Overnite filed a request for review of the decision with the Board. By order dated March 20, 1996, the Board remanded Objections 1, 4, and 5 for a hearing, but denied the request for review in all other respects.

On May 31, 1996, the Hearing Officer issued his Report and Recommendations on Objections, in which he found that the objections were without merit and recommended that the Board dismiss them and certify the election results. Overnite filed exceptions to the Hearing Officer's Report. Nonetheless, on February 7, 1997, the Board adopted the Hearing Officer's findings and recommendations and certified the union as the exclusive bargaining representative for Overnite's Atlanta employees. Overnite filed a Motion for Reconsideration in light of the Board's pending consideration of two cases, *Flamingo Hilton–Reno*, Case No. 32–CA–14378, 1996 WL 293527 and *Randell Warehouse of Arizona, Inc.*, Case No. 28–RC–5274 (June 12, 1996), in which it claimed the Board was expected to clarify the standards for videotaping and photography during union elections. The Board denied the motion on March 20, 1997.

By letter dated February 12, 1997, Overnite notified the union that it would not

recognize or bargain with it. *See* J.A. 122A. The union subsequently filed an unfair labor practice charge alleging that the company's refusal to bargain violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5). *See* J.A. 123. One month later, the Board issued a complaint alleging that Overnite violated sections 8(a)(1) and (5) of the Act. Overnite answered and the General Counsel moved for summary judgment. On May 30, 1997, a three-member panel of the Board issued its Decision and Order concluding that Overnite's refusal to bargain with the union violated sections 8(a)(1) and (5) of the Act. Accordingly, it ordered Overnite to bargain with the union upon request, embody an understanding in a signed agreement, and post an appropriate notice. *See Overnite Transp. Co.*, 323 N.L.R.B. No. 145 (May 30, 1997). Overnite filed its Petition for Review of the Board's Decision and Order on June 10, 1997. The Board filed a cross-application for enforcement of its order.

## II. DISCUSSION

### A. *The Board Reasonably Determined that Videotaping and Photographing of Employees Did Not Constitute Surveillance Sufficient to Invalidate the Election*

Overnite claims that the bargaining order issued by the Board should not be enforced because pre-election and election day video and photographic surveillance destroyed the conditions required for a free and fair election. Overnite argues that the Board was incorrect to conclude that the videotaping and photography by McConley and others was not fairly attributable to the union. Accordingly, because McConley and the others were union representatives, Overnite contends, the election must be set aside if their conduct " 'reasonably *tends to interfere* with employees' free and uncoerced choice in the election.' " *See* Brief of the Petitioner at 29 (quoting *Pepsi–Cola Bottling Co.*, 289 N.L.R.B. 736, 736 (1988) (emphasis added by Petitioner)). Even if the Board were correct to conclude that all but one of the videos and photographs were taken by third parties, Overnite continues, the election should still be set aside because the surveillance created " 'an *atmosphere of fear and reprisal* such as

to render a free expression of choice impossible.' " *Id.* at 29–30 (quoting *Millard Processing Serv., Inc., v. NLRB*, 2 F.3d 258, 261 (8th Cir.1993), *cert. denied*, 510 U.S. 1092, 114 S.Ct. 922, 127 L.Ed.2d 215 (1994) (emphasis added by Petitioner)). The NLRB, in turn, argues that the Board's finding that the videotaping and photography was not attributable to the union (except for the union meeting incident) was reasonable and supported by the evidence and thus it was reasonable for the Board to apply the less stringent third-party standard to evaluate the legality of the election. The NLRB further says that the Board's conclusion that the videotaping and photography by the third parties (and in one instance by a union representative) did not constitute surveillance sufficient to invalidate the election was also reasonable and supported by the evidence. We affirm the Board's decision.

1. *Pro-union employees were third parties, not union agents*

 We begin by resolving a threshold issue: whether those who engaged in videotaping and photographing did so as agents of the union or whether they were simply third parties, albeit enthusiastic pro-union supporters. In considering claims of election misconduct, the Board and the courts have long recognized a distinction between actions of a party to the election and those of employees or other third parties. *See, e.g., NLRB v. Herbert Halperin Distributing Corp.*, 826 F.2d 287 (4th Cir. 1987). This distinction is based on a recognition that "[n]ot every employee who supports the union or speaks in its favor is a union agent" and "neither the union nor the employer can control everything these employees say or do." *Id.* at 291 (citations omitted). Where election misconduct is attributable to one of the parties, the Board will overturn the election if the misconduct "created such an environment of tension and coercion ' "as to have had a probable effect upon the employees' actions at the polls" ' and to have ' "materially affected the results of the election." ' " *Swing Staging Inc. v. NLRB*, 994 F.2d 859, 861–62 (D.C.Cir. 1993) (quoting *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 827 (D.C.Cir.

1970) (citation omitted)). Where misconduct is attributable to third parties, however, the Board will overturn an election only if the misconduct is "so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." *Westwood Horizons Hotel,* 270 N.L.R.B. 802, 803 (1984).

■ In considering questions of agency under the National Labor Relations Act (NLRA), we turn to section 2(13) of the Act, which provides as follows: "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13) (1994). The Board applies ordinary common law principles of agency in deciding issues of agency under section 2(13). *See International Longshoremen's Ass'n v. NLRB,* 56 F.3d 205, 212 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1158, 116 S.Ct. 1040, 134 L.Ed.2d 188 (1996) ("the legislative history of that statute makes clear that it was designed to render 'both employers and labor organizations ... responsible for the acts of their agents in accordance with the ordinary common law rules of agency'") (citations omitted); *Local 1814, Int'l Longshoremen's Ass'n v. NLRB,* 735 F.2d 1384, 1394, *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) ("Beyond doubt, the legislative intent of this provision was to make the ordinary law of agency applicable to the attribution of individual acts to both employers and unions."); *see also* H.R. CONF. REP. No. 80–510 at 36 (1947), *reprinted in* 1947 U.S.C.C.A.N. 1135, 1142 ("[B]oth employers and labor organizations will be responsible for the acts of their agents in accordance with the ordinary common law rules of agency."). Thus, the Board must apply the common law meaning of the terms "agency" and "apparent authority" in determining whether the union will be held responsible for the acts of one of its members.

■ Since Congress did not delegate to the Board the power to interpret section 2(13) of the NLRA, the Board's determination of whether a particular actor is properly considered an agent or was acting with apparent authority is granted only limited deference. In other words, the court "need not defer to the agency's judgment as we normally might under the doctrine of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)." 56 F.3d at 212. However, the standard of review is not *de novo.* We have previously held that "the existence of an agency relationship is a factual matter ... which cannot be disturbed if supported by 'substantial evidence on the record considered as a whole.'" *Local 1814, Int'l Longshoremen's Ass'n,* 735 F.2d at 1394. Elsewhere, we have explained that common law agency questions are "'permeated at the fringes by conclusions drawn from the factual setting of the particular industrial dispute,'" and therefore "we must give due weight to the Board's judgment to the extent that 'it made a choice between two fairly conflicting views.'" *International Longshoremen's Ass'n,* 56 F.3d at 212 (citation omitted); *see C.C. Eastern, Inc. v. NLRB,* 60 F.3d 855, 858 (D.C.Cir.1995) (noting that in resolving issues requiring reference to the common law of agency, the court does not review the Board's determination *de novo,* but instead will "uphold the Board if it can be said to have 'made a choice between two fairly conflicting views'") (citation omitted). Read together, these cases stand for the proposition that we review the Board's agency law decisions to determine whether its decision is reasonable, consistent with its prior decisions, supported by substantial evidence, and consistent with common law determinations on similar facts. In doing so, we must bear in mind that "[t]ransplantation of ordinary agency law, which arises out of ordinary contract and tort disputes, into the NLRA context necessarily requires sensitivity to the particular circumstances of industrial labor relations." *Local 1814, Int'l Longshoremen's Ass'n,* 735 F.2d at 1394.

Both parties acknowledge that Dennis McConley and the other union supporters' conduct was not expressly authorized by the union. However, Overnite argues that they had apparent authority to act on behalf of the union because McConley was a member

of the Union Organizing Committee and campaigned aggressively for the union, McConley stood on the podium with union officers during a union meeting, McConley was in a photograph with the Union International President placed on a union flyer, and at least some of the "surveillance" took place in the presence of union officials.

"Apparent authority" exists where the principal engages in conduct that "reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." RESTATEMENT (SECOND) OF AGENCY § 27 (1992). For there to be apparent authority, however, the third party must not only believe that the individual acts on behalf of the principal but, in addition, "either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." Id. at cmt. a.

The fact that McConley and Reeves were members of the Union Organizing Committee, alone, is not sufficient to confer apparent authority on them. The Hearing Officer found that the Union Organizing Committee was not a formally structured organization formed by the union; the Committee was entirely voluntary and members were not paid. Although the Hearing Officer found that International Organizer Keith Maddox visited the Atlanta facility, there was no evidence that he gave any specific directives to employees on the Committee. In *Amalgamated Clothing and Textile Workers Union v. NLRB*, 736 F.2d 1559 (D.C.Cir.1984), we said mere membership in an in-plant organizing committee is not sufficient, by itself, to make the actions of an individual attributable to the union. *See id.* at 1565 (holding that members of in-plant organizing committee, which supported the organizing campaign, drafted, endorsed and distributed leaflets, solicited employees to join the union, wore pro-union insignia, and made visits to the homes of fellow employees to urge them to support the union, were not agents of the union, in part because "none of the IPOC members held official positions with the union, received formal training or instruction from the union, or were paid by the union for their work on the campaign"); *see also Kux Mfg. Co. v. NLRB*, 890 F.2d 804 (6th Cir. 1989) (finding conduct of members of in-plant organizing committee not attributable to union); *Uniroyal Technology Corp. v. NLRB*, 98 F.3d 993 (7th Cir.1996) (upholding Board's determination that member of in-plant organizing committee was not an agent of the union where he did not have substantial union responsibilities); *NLRB v. Herbert Halperin Distributing Corp.*, 826 F.2d 287, 290-91 (4th Cir.1987) (upholding Board's determination that employees were not agents of the union where the union's professional staff was heavily involved in the campaign and where union did not rely primarily on employees to organize the other workers). Overnite presented no evidence that the union encouraged any belief among employees that McConley had union allowance to engage in videotaping in the break room. Nor was there evidence that the union ratified McConley's videotaping activity by viewing or distributing it, or by showing it to employees. Thus, while it may be the case that several employees did in fact believe that McConley acted on behalf of the union, the union cannot be held responsible for McConley's conduct because it did nothing to confer apparent authority upon him.

 The same is true of the other union supporters who photographed and took videotapes of various Overnite employees. The only evidence that Overnite offers in support of its case for apparent authority is the fact that union officials were present when these unidentified employees took photographs and videotapes[1]; in essence, Overnite argues

---

1. Overnite argues that it was entitled to inferences that the unidentified employees were authorized or encouraged to engage in surveillance by union officials and that the "surveillance" was intended to be used for purposes of intimidation and retaliation because the union failed to present testimony denying those propositions. We explained the adverse inference rule in *International Union (UAW) v. NLRB*, 459 F.2d 1329 (1972) as follows:

> The theory behind the rule is that, all other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case. If evidence within the party's control would in fact strengthen his

that the union officials should have realized that their failure to take action to prevent pro-union employees from photographing and videotaping other employees would foster the belief the picture-takers were authorized to act on behalf of the union. The Hearing Officer said "no" to this proposition. Indeed, he labeled the evidence "grossly insufficient" to support that notion, noting that Overnite had "presented no evidence that any of the union officials engaged in, condoned, or ratified any of the conduct presented by testimonial evidence." J.A. 53 n.18. Based on the evidence before us, we conclude that the Hearing Officer was right. The simple fact that a union official stood nearby while a pro-union employee took pictures is not enough to confer apparent authority on the employee, particularly where there was no evidence that union officials made or attempted to make use of the photographs or videotapes or even viewed the tapes and photographs.

■ Evidence that the union supporters who participated in the pro-union gathering outside the Atlanta facility on election day had apparent authority to act on behalf of the union is also lacking. Overnite claims that the union supporters yelled loudly, leafleted individuals entering the voting place, operated a large cookout, and engaged in excessive horn blowing easily heard inside the polling place, as well as photographed and videotaped employees around the election facility. In support of its claim that these union supporters were agents of the union Overnite offers the fact that several union officials were present and observed these activities. Overnite also claims that

the election day gathering was a "picket line," and that the union was therefore responsible for keeping the gathering under control and can be held responsible for the actions of those in attendance.[2]

■ Again, however, this evidence is insufficient to show apparent authority to act on behalf of the union. The mere presence of union officials at a gathering is insufficient to grant all participants apparent authority to act on behalf of the union. Moreover, the gathering clearly was not a picket line. Not every gathering arranged by the union can be called a picket line; in order for there to be a picket line there must be some evidence that the union organized a picket line and exercised control over it. See, e.g., Dairy Employees Local 695, 221 N.L.R.B. 647, 653 (1975) (holding that picket line existed where pickers were paid by union and received instructions from picket captains who attended daily union meetings); Boilermakers Local 696, 196 N.L.R.B. 645, 646 (1972) (holding that picket line existed where union assigned picket captains and individual pickets to shifts). Here, there was no evidence that a union official directed the activities of or assigned responsibilities to those who attended the gathering and engaged in the complained of activity. Faced with a somewhat parallel situation and similar arguments, the Seventh Circuit recently held: "In our view, the union's efforts to pump up the electorate and inspire enthusiasm for the union cause did not transform the assorted supporters and revelers who spent all or part of the day in front of Overnite's terminal into union agents. The union's actions were notable not

---

case, he can be expected to introduce it even if it is not subpoenaed. Conversely, if such evidence is not introduced, it may be inferred that the evidence is unfavorable to the party suppressing it.
*Id.* at 1338. Although the courts can reverse the Board for an unexplained failure to draw the inference, *see, e.g., NLRB v. Selwyn Shoe Mfg. Corp.,* 428 F.2d 217, 225 (8th Cir.1970); *NLRB v. Ford Radio & Mica Corp.,* 258 F.2d 457, 463 (2d Cir.1958), the decision of whether to draw an adverse inference has generally been held to be within the discretion of the fact finder. *See, e.g., International Union,* 459 F.2d at 1339. Here, there was good reason for the union to believe that Overnite had failed to meet its burden of proof, therefore the decision of the Board not to draw an adverse inference against the union was

rational and consistent with this court's and the Board's previous decisions. *See, e.g., id.* at 1338 ("Of course, if a party has good reason to believe his opponent has failed to meet his burden of proof, he may find no need to introduce his strong evidence.") (citation omitted).

**2.** It is well-settled that when a union pickets an employer, it empowers picketers to act on behalf of the union, *see, e.g., Dairy Employees, Local 695,* 221 N.L.R.B. 647, 653 (1975), and that if the union fails to control the line, it can be held responsible for those in attendance, *see, e.g., United Tel. Answering and Communications Serv. Union, Local 780 v. Federated Communications Services, Inc.,* 276 N.L.R.B. 507, 510 (1985).

for their express direction of those persons' actions, but for their passivity." *Overnite Transp. Co. v. NLRB*, 104 F.3d 109, 114 (7th Cir.1997). Similarly, here, the existence of the pro-union gathering outside the polling place did not transform participants into agents of the union.

2. *The Board reasonably determined that third-party misconduct did not create an atmosphere of fear and reprisal*

█ Concluding, then, that all but one of the union supporters who engaged in the activity complained about were not union agents but instead third parties, we turn to the second step of the analysis: Was the misconduct nonetheless "so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible?" *Westwood Horizons Hotel*, 270 N.L.R.B. 802, 803 (1984). We affirm the Board's negative answer to that question.

The videotaping in the break room by McConley was insufficient to create an atmosphere of fear and reprisal. Although a few employees may have feared that the videotape could be used to retaliate against them, there is no evidence that McConley suggested any such use. Moreover, the Hearing Officer found no evidence that information about the break room incident was widely disseminated among employees at the Atlanta Service Center. Thus Overnite has not demonstrated that the videotaping, without more, interfered with employee free choice, and the Board's conclusion that it was not sufficient grounds for overturning the union election was entirely reasonable.

█ The other incidents of videotaping and photography of Overnite employees by unidentified union supporters—considered both individually and cumulatively (as well as in conjunction with the other misconduct alleged)—did not create an atmosphere of fear and reprisal either. Only one employee, Parker Roberts, asserted any concern that the election day videotaping would be used to intimidate him, *see* Transcript at 465–66 (May 9, 1996) (testimony of Parker Roberts), and he admitted that he did not personally receive any threats, *see id.* at 469. Here again there was no evidence that any inci-

dents of photography and videotaping were widely discussed by the employees at the facility or that other employees felt intimidated. The election day gathering at which the photography and videotaping took place was described by Roberts himself as having a "sort of a party attitude," *id.* at 489, and by another pro-company employee as "friendly." Transcript at 428–29 (May 9, 1996) (testimony of Albert Williams). Thus, the Board could reasonably conclude that the photography and videotaping by unidentified pro-union employees on election day did not create an atmosphere of fear and reprisal so as to render a free election impossible. *See, e.g., Nu Skin Int'l, Inc.*, 307 N.L.R.B. 223, 224–35, 1992 WL 87489 (1992) (finding no coercion when union agents photographed employees at union-sponsored picnic); *Friendly Ice Cream Corp.*, 211 N.L.R.B. 1032, 1033, *enforced*, 503 F.2d 1396 (1st Cir.1974) (finding photography by pro-union employees at a company dinner did not create an atmosphere of fear and coercion rendering a free election impossible). The Board could also reasonably conclude that the impact of the election day conduct in conjunction with prior videotaping and photography incidents was insufficient to warrant overturning the election. *See Amalgamated Clothing and Textile Workers v. NLRB*, 736 F.2d 1559, 1569 (D.C.Cir.1984) (noting that the cumulative impact of allegedly objectionable conduct " 'may not be used to turn a number of insubstantial objections to an election into serious challenge' ") (citation omitted).

3. *The Board reasonably determined that the union hall videotaping by Local 728's Secretary did not materially affect the results of the election*

█ Both parties agree that Local 728's Secretary was a union agent. In this one instance, therefore, the court must determine whether it was reasonable for the Board to conclude that her actions did not "create[ ] such an environment of tension and coercion ' "as to have had a probable effect upon the employees' actions at the polls" ' and to have ' "materially affected the results of the election." ' " *Swing Staging Inc. v. NLRB*, 994 F.2d 859, 861–62 (D.C.Cir.1993) (quoting

*Amalgamated Clothing Workers v. NLRB,* 424 F.2d 818, 827 (D.C.Cir.1970) (citation omitted)). We hold that it was.

Although the videotaping may have made some employees uncomfortable, the record does not support a finding that the incident created such an environment of tension and coercion as to have had a probable effect upon the employees' actions at the polls or to have materially affected the results of the election. The Board has previously found, in *Nu Skin Int'l, Inc.,* 307 N.L.R.B. 223 (1992), that it is permissible for the union to take pictures of employees who voluntarily attend a union-sponsored picnic. *See id.* at 224–25. Here, as in *Nu Skin,* the employees voluntarily attended the union meeting, which was held off-premises. And, again as in *Nu Skin,* no evidence was presented that any threats of retaliation were made in conjunction with the videotaping by any union official at any time. Indeed, no individual or group of individuals were ever singled out to be videotaped. Thus, we affirm the Board's holding that the offsite incident of union videotaping of employees who attended a union hall meeting did not rise to the level of unlawful surveillance or misconduct sufficient to set the election aside.

### B. *The Board Reasonably Found That There Was No Unlawful Electioneering*

 Overnite claims finally that there was unlawful electioneering by the union and its supporters in front of the voting place on election day. Union supporters not only engaged in surveillance of employees entering the polling center, but they also held a "raucous" rally near the polling center, which was attended by International Organizer Maddox, Teamsters International President Carey, and the President of Local 728. According to the company, union supporters who ran the gathering held a cookout, which Overnite estimates included 100 employees at various points, and dispensed free food and drink. The crowd engaged in constant "hooting and hollering" and chanted slogans, and Teamster drivers from other trucking companies honked their horns as they drove by the gathering. The effect of this activity, Overnite argues, was to destroy the "laboratory conditions," *General Shoe Corp.,* 77 N.L.R.B. 124, 127 (1948), that must be present on election day to ensure a free and fair election. Therefore this court should refuse to enforce the bargaining order issued by the Board.

The Hearing Officer, however, found that Overnite "presented no evidence that any union supporter approached any employee while that person was waiting in line to vote," or that there was even "an established 'no-electioneering zone' at the polling place." Hearing Officer's Report and Recommendations on Objections (May 31, 1996) at 22. The Hearing Officer also found that Overnite had presented no evidence of any campaign rhetoric or appeals for votes from union supporters as employees waited in line to vote. Finally, the Hearing Officer found that the company had presented no evidence that union officials encouraged the horn blowing by Teamster truckers or that employees complained about it. *See id.* at 22–23. Thus, the Hearing Officer concluded that there was no unlawful electioneering, and the Board adopted his findings. We affirm the Board's holding.

 The Board does not prohibit all electioneering in the vicinity of the polling place on election day. Indeed, the Board has recognized that "it is unrealistic to expect parties or employees to refrain totally from any and all types of electioneering in the vicinity of the polls." *Boston Insulated Wire & Cable Co.,* 259 N.L.R.B. 1118, 1118 (1982), *enforced,* 703 F.2d 876 (5th Cir.1983); *see also NLRB v. Hudson Oxygen Therapy Sales Co.,* 764 F.2d 729, 732 (9th Cir.1985) (holding that "the Board permits legitimate 'electioneering' subject to specific regulations"). Instead, the Board considers a range of factors and circumstances in determining whether electioneering activity is sufficient to justify overturning an election. First, it determines whether the activity violates the *Milchem* rule prohibiting "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots." *Milchem, Inc.,* 170 N.L.R.B. 362, 362–63 (1968). Here, that rule is not implicated at all because Overnite presented no evidence that any union supporter

approached any employee while she was waiting in line to vote. Moreover, *Milchem* applies only to conduct by agents of the parties to the election, *see NLRB v. Hood Furniture Mfg. Co.,* 941 F.2d 325, 329 (5th Cir.1991), and there was no evidence indicating that the truckers who blew their horns while passing the facility or the union supporters who chanted slogans at the gathering were union agents clothed with actual or apparent authority to act on behalf of the union.[3]

■■■■■■ Where an employer objects to electioneering not encompassed within the *Milchem* rule, the Board will overturn the election only if the electioneering " 'substantially impaired the exercise of free choice.' " *NLRB v. Del Rey Tortilleria, Inc.,* 823 F.2d 1135, 1140 (7th Cir.1987) (citation omitted). The Board generally considers the nature and extent of the electioneering, whether it happened within a designated "no electioneering" area, whether it was contrary to the instructions of the Board's election agent, whether a party to the election objected to it, and whether a party to the election engaged in it. *See id.* In the case at hand, Overnite has failed to demonstrate that there was any designated "no electioneering" area, that there were any instructions issued by a Board agent, that any party objected to the activities of the union supporters prior to or during the election, or that the union was responsible for directing or participating in the objectionable activity. Under these circumstances, it was entirely reasonable for the Board to refuse to overturn the results of the election.

## C. The Board Reasonably Refused to Delay Certification of the Union Pending Its Decisions in Flamingo Hilton–Reno and Randell Warehouse

■■■ Overnite sought rehearing of the Board's decision in this case based upon the pendency of the full Board's decision in two forthcoming cases. A panel of the Board denied the motion "as raising nothing not previously considered." Order Denying Motion for Reconsideration (March 20, 1997). Overnite asks for a remand of this case to the Board for further proceedings because the Hearing Officer and the Board relied on case law that the Board has indicated may no longer be valid. In particular, Overnite argues that this case should be decided in light of the Board's forthcoming decisions in the consolidated cases, *Flamingo Hilton–Reno,* Case No. 92–CA–14378, which involved videotaping employees for a pro-company video to be shown to all the employees prior to a union election, and *Randell Warehouse of Arizona, Inc.,* Case No. 28–RC–5274, which involved photography of employees by union officials for use in campaign propaganda. Overnite points to *Allegheny Ludlum Corp. v. NLRB,* 104 F.3d 1354, 1363 (D.C.Cir.1997), as support that this court should remand cases to the Board when the Board has failed to provide "some clear guidelines" regarding the critical issues in the case.

The NLRB contends that the Board's denial of the motion for reconsideration was a reasonable exercise of its discretion. The issues in this case, it claims, are substantially different from the issues presented in *Flamingo Hilton–Reno* and *Randell Warehouse.* In those two cases, the NLRB explains, the parties to the election were responsible for the videotaping and photographing of employees. Here, however, all but one of the incidents of videotaping and photography were not attributable to the union but instead to third-party union supporters. Contrary to Overnite's assertion that the legal standards in this area are unclear, the NLRB claims that the standard for assessing the legality of third-party conduct has been both clear and consistent. Moreover, the NLRB claims that Overnite's reliance on *Allegheny Ludlum* is misplaced because that case involved videotaping and photography by an employer, not a third party.

We affirm the Board's decision because the pending cases involve issues that are substantially different from those posed by the case at hand. On June 12, 1996, the

---

3. This finding is consistent with the Seventh Circuit's decision in *Overnite Transp. Co. v. NLRB,* 104 F.3d 109 (7th Cir.1997), which involved a fact situation almost identical to the case at hand. There, the court affirmed the Board's conclusion that "the group were [sic] nothing more than boisterous union supporters and sympathizers." *Id.* at 114.

Board issued a Notice of Hearing scheduling oral argument in *Flamingo Hilton–Reno* and *Randell Warehouse* for August 7, 1996, and directing the parties to prepare to argue five questions, including: "What standard should the Board apply to determine whether photographing or videotaping of employees is an unfair labor practice or objectionable conduct?"; "What weight, if any, should the Board give to evidence that the purpose of the photographing or videotaping was explained to employees?"; and "Are there other factors that the Board should consider in determining whether photographing or videotaping is coercive and/or objectionable conduct?"Notice of Hearing, Case No. 32–CA–14378 and Case No. 28–RC–5274 (June 12, 1996) (quoted in Brief of the Petitioner at 23). Although the questions, read broadly, could overlap with the issues presented in this case, it appears to us that the context in which the issues will be examined is quite different. The pending cases involve incidents of surveillance attributable to a party to the election, not to third parties. With one limited exception, the case at hand involves conduct by third parties. Moreover, the pending cases center on whether use of videotape and photography in campaign literature is an unfair labor practice or constitutes objectionable conduct and on the tension between protecting the free speech interests of the parties and providing a free and fair election. These issues are not directly implicated in this case, and therefore their resolution is unlikely to have much if any effect on the outcome. In addition, the single incidence of videotaping by the union of workers who voluntarily attended a union meeting was so clearly insufficient to warrant overturning the election that it is unnecessary to await the Board's decision in the pending case. Thus, the Board was well within its province in concluding that Overnite's motion for reconsideration raises "nothing not previously considered" and therefore lacked merit. Order Denying Motion for Reconsideration.

### III. CONCLUSION

For the foregoing reasons, we hold that Overnite engaged in unfair labor practices within the meaning of sections 8(a)(1) and (5)

when it refused to bargain with the union as the exclusive collective-bargaining representative of Overnite's employees. We therefore deny Overnite's petition for review and grant the Board's cross-petition for enforcement.

*So ordered.*