# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 9, 2006          Decided March 7, 2006

No. 04-1440

KING ELECTRIC, INCORPORATED,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL 8,
INTERVENOR

———

Consolidated with
05-1012

———

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———

*Maurice Baskin* argued the cause for petitioner. With him on the briefs were *Alan G. Ross* and *Lesley A. Pate*.

*Philip A. Hostak*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief

were *Arthur F. Rosenfeld*, Acting General Counsel at the time the brief was filed, *Margery E. Lieber*, Acting Associate General Counsel at the time the brief was filed, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney. *Steven B. Goldstein*, Attorney, entered an appearance.

*Basil W. Mangano* was on the brief for intervenor. *Joseph M. D'Angelo* entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: King Electric, Inc., an electrical contractor in Toledo, Ohio, seeks review of an NLRB order to bargain with the International Brotherhood of Electrical Workers, Local Union Number 8. King challenges the union's certification based on the union's conduct prior to and on the day of an election. We grant King's petition.

I

The union filed an election petition in June 2001 (almost five years ago)[1] seeking representation of a unit of approximately ten employees. During the campaign, union representatives described certain benefits that the union made available to employees of union-signatory employers. Most notably the employees were told that they were eligible for

---

[1]*See, e.g., Cogburn Health Ctr., Inc. v. NLRB*, __ F.3d __, __, 2006 WL 435406, at *8 (D.C. Cir. Feb. 24, 2006) (describing "the Board's extraordinary delays in case processing").

employment referrals to union-signatory contractors via a Joint Apprenticeship Training Committee (JATC) because at least 51% of King's employees had signed authorization cards, and under the program — supposedly approved by the Labor Department — once that threshold was passed, the union was "allowed" to put employees in the program regardless of whether the union won or lost the election. According to the Board, without the "51% rule," King employees would not have been eligible for JATC referrals because King was not a union-signatory employer.

On the day of the election, a Board agent set up a polling center in a stockroom at King, and nine employees voted. Shortly before polling was to begin, the agent directed the two present union representatives to leave the voting area and not to stand outside the stockroom door, such that employees would have to pass them on their way to vote. The representatives asked if they could wait in their car, and after determining that the car was parked across the street from King's offices, the Board agent replied that the car was fine. Instead of going to their car, however, the representatives went to a shaded area behind a building off King's property, approximately forty to fifty feet from the stockroom door, and along one of two driveways leading to King's property. At one point after the polls had opened, a King employee, Dennis Stewart, arrived and stopped to speak with the union representatives. The three were approached by other employees who had already voted, and after approximately a minute and a half of conversation, Stewart departed for the stockroom to vote. Some minutes later, another employee, Scott Widmer, drove onto King's property and stopped to speak briefly with the union representatives before voting.

The union ultimately prevailed with five votes in favor of the union and four against; the day following the election, six of

King's ten employees quit and went to work for union-signatory companies pursuant to union referrals. King filed an objection to the election claiming improper electioneering on election day and that the union had improperly promised benefits to employees during the campaign. One hearing officer concluded that the union's conduct on election day was insignificant. Another hearing officer examined the improper benefits claims. Although acknowledging that the "[u]nion promised jobs with union signatories," the hearing officer concluded that the union had done so "win, lose, or draw" — "these promises were not made in exchange for a pledge of [u]nion support from the employees," nor contingent on a union victory in the election.

King refused to bargain with the union and challenged the two hearing officers' determinations in a consequent unfair labor practice proceeding. King also claimed that the Board should recognize that "unusual circumstances," i.e., that six of the ten employees quit the day after the election, relieved it of any duty to bargain with the union. The Board, as is typical, declined to reexamine the hearing officers' determinations in the unfair labor practice proceeding and rejected the "unusual circumstances" defense.

II

We can easily dispose of two of petitioner's arguments. The union's election day conduct clearly did not constitute impermissible electioneering under Board rules that we have approved. The hearing officer credited the testimony of one of the union representatives that he and another were forty to fifty feet away from the stockroom door and off King's property, and although King disputes these findings, it presents no grounds allowing us to quarrel with the hearing officer's credibility determinations. *See Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998). Nor was there a violation of the

Board's "*Milchem* Rule," which provides that "sustained conversation with prospective voters waiting to cast their ballots, regardless of the content of the remarks exchanged, constitutes conduct which, in itself, necessitates a second election." *Milchem, Inc.*, 170 N.L.R.B. 362, 362 (1968); *see also Nathan Katz Realty, LLC v. NLRB*, 251 F.3d 981, 991 (D.C. Cir. 2001). The union representatives spoke with only two employees before they voted, for one-and-a-half minutes and three minutes, respectively, and at a distance of fifty-five to sixty-five feet from the voting booth.

To be sure, the Board also applies a multi-factor test to determine whether the electioneering, even if it did not violate *Milchem*, was nonetheless objectionable because it "substantially impaired the exercise of free choice." *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 270 (D.C. Cir. 1998) (citation and internal quotation marks omitted). That test considers "the nature and extent of the electioneering, whether it happened within a designated 'no electioneering' area, whether it was contrary to the instructions of the Board's election agent, whether a party to the election objected to it, and whether a party to the election engaged in it." *Id.*; *see also Nathan Katz Realty*, 251 F.3d at 991. As the hearing officer concluded, while the activity at issue was engaged in by parties to the election — the union representatives — all other factors militate against a finding of substantial impairment. The contacts between the union representatives and employees Stewart and Widmer were of short duration and innocuous in nature, there was no designated "no electioneering area," the representatives did not act contrary to the Board agent's instructions, and King Electric president John King, while aware of the union representatives' presence, never complained to the Board agent while the polls were open.

King relies on *Nathan Katz Realty*'s statement "that a party engages in objectionable conduct sufficient to set aside an election if one of its agents is continually present in a place where employees have to pass in order to vote." 251 F.3d at 993. In this case, only two employees passed the union representatives on their way to vote; the rest were already on King's property at the time the polls opened. And in any event, the union representatives were positioned along only one of two driveways leading to King's property. The two employees could have bypassed the union representatives had they so desired.

The Board therefore was not unreasonable in determining that the union representatives did not engage in impermissible electioneering. As we have said previously, "[t]he representation election process under the NLRA is not an abstract exercise in achieving ideal conditions," *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1563 (D.C. Cir. 1984)*,* and "it is unrealistic to expect parties or employees to refrain totally from any and all types of electioneering in the vicinity of the polls," *Overnite Transp. Co.*, 140 F.3d at 269 (citation and internal quotation marks omitted).

Nor do we think there is much to petitioner's "unusual circumstances" argument. The Board has never applied that doctrine, which sometimes justifies an employer's petition for relief from a continuing obligation to bargain with an incumbent union, *see Brooks v. NLRB*, 348 U.S. 96, 98-99, 103 (1954), to allow a challenge to a certification where a number of employees have left after an election, *see Pearson Educ., Inc. v. NLRB*, 373 F.3d 127, 133 (D.C. Cir. 2004). That is not to say that the Board could not do so, but we think the Board is clearly within its legitimate policy-making role when it determines, as it did here, that a turnover of employees is not a fundamental change in the *unit* justifying invocation of the "unusual circumstances" doctrine. As we note below, however, we do not

7

think that the actions of the six employees on the day following the election were irrelevant.

## III

Turning to the allegations that the union improperly promised benefits to the employees in the campaign, the parties agree that a union may not offer employees a "tangible economic benefit" in the pre-election period. *Freund Baking Co. v. NLRB*, 165 F.3d 928, 931-32 (D.C. Cir. 1999). To be sure, a union can promise benefits to which employees would be *entitled* as union members or as employees of a union-signatory company, *see Int'l Bhd. of Elec. Workers, Local Union 103 (Drew Electric Co.)*, 312 N.L.R.B. 591, 592-93 (1993); but such a promise cannot be contingent on the vote results, nor would it be appropriate, the Board concedes, for the union to make such a promise contingent on employees' staying to vote on election day. If the union retained discretion whether to award such benefits — the employees were not actually *entitled* to referral to union-signatory employers — then the union's promise to do so in this case could be thought a quid pro quo for a majority's voting for the union or, at least, staying to vote on election day.

Petitioner argues that the very fact that "more than half the bargaining unit took the [u]nion up on its offer by quitting their employment with King the day after the election and receiving immediate placement by the [u]nion," demonstrates that such an improper contingent promise had been made. King asserts that its employees would not have been entitled to referrals under the JATC program without the union's waiver. In other words, the employees' behavior tends to show that they understood that the union had such discretion.

The hearing officer, however, credited the testimony of a union official that the union's policy to enroll King employees

in the JATC referral program was pursuant to Labor Department guidelines and contingent only on the majority of employees' signing authorization cards, such that employees would be eligible "win, lose, or draw" in the election.[2]  The testimony of John King and one employee to the effect that the union had offered job referrals (at higher pay) if the employees would stay through the vote was rejected as not credible.  And the hearing officer regarded the circumstantial evidence that more than half of the employees quit the day after the election to work at union-signatory companies as irrelevant, since she believed it was inappropriate to consider post-election evidence in determining whether the union had engaged in pre-election objectionable conduct.

Although we are obliged to defer to evidentiary findings — particularly when they are based on credibility determinations, *see Amalgamated Clothing & Textile Workers Union*, 736 F.2d at 1563; *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) — when the Board (or any agency) is "engaged in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence [including circumstantial evidence] fairly demands." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998); *see also id.* at 371.  The hearing officer pointed to no Board policy that would have precluded her from considering the employees' post-election conduct as circumstantial evidence supporting petitioner's contention (nor could we imagine any such rule of evidence as reasonable).  Therefore, her finding cannot be

---

[2]Petitioner seemed to raise an interesting argument that the Department of Labor guidelines themselves are inconsistent with the NLRA, but we cannot consider it because it was not raised before the Board.

thought supported by substantial evidence.  Of course had she considered that evidence and still credited the union witness, we might well have deferred to her finding — but she did not.

That is not the only defect in the hearing officer's decision. As we have indicated, a union's grant to employees of a benefit to which they are not otherwise entitled, during an election campaign, is still objectionable — perhaps a violation of the Act[3] — whether or not conditioned on how employees vote in an election.  The union representative's testimony before the hearing officer regarding the "51% rule" was equivocal.  During cross-examination, union representative Roy Grosswiler testified that "in organizing in regards to apprenticeship," the union can "circumvent the selection procedure . . . when [it] [has] an employer where 51 percent of their employees have signed authorization cards."  Then the union is "allowed to [offer] direct entry into [the] apprenticeship program[,] rather than [requiring the employees to] go through the selection procedure."  On re-direct Grosswiler added, "we've been doing that for eight years."  This begs the question whether the union employed the "51% rule" in the normal course, during organizing or otherwise, or whether it was merely something that was in the union's discretion to offer in appropriate situations — perhaps when necessary in order to encourage pro-

_____

[3]*See Freund Baking Co.*, 165 F.3d at 931 (noting that "the Act . . . bars both crude and subtle forms of vote-buying on the part of the union and citing *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 279 (1973), which held that a union's promise of "a special benefit to those who sign up for a union" runs afoul of "[t]he right of a free choice . . . inherent in the principles reflected in § 9(c)(1)(A)" of the Act).  *But compare* 29 U.S.C. § 158(b)(1)(A) (prohibiting labor organizations' restraint or coercion of employees in the exercise of their rights), *with id.* § 158(a)(1) (on the part of employers, also prohibiting "interfer[ence]" with such rights).

union votes. Had the hearing officer concluded, on the basis of Grosswiler's testimony, that the "51% rule" was invariably employed by the union, we might have been willing to defer to such a finding.

But the hearing officer never made a finding that the union treated the "51% rule" as binding on it and thereby unconditionally available to employees. To be sure, the hearing officer stated "that employment with union-signatory companies was not conditioned on the employees' support for the union," but that is really not an answer to this question. If the union had promised the employees a benefit that was not automatic with union membership, it would be objectionable even if conditioned on neither the result of the vote nor an employee's willingness to stay for the vote. *See Freund Baking Co.*, 165 F.3d at 931.

IV

Based on the foregoing, we grant King's petition for review and deny the Board's cross-application for enforcement.