Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 20, 2009        Decided December 11, 2009

No. 09-1062

ALASKA AIRLINES, INC.,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

———

On Petition for Review of an Order
of the Transportation Security Administration

———

*M. Roy Goldberg* argued the cause and filed the briefs for petitioner.

*Jeffrey Clair*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the briefs was *Scott R. McIntosh*, Attorney.

Before: SENTELLE, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Pursuant to the Aviation and Transportation Security Act, Pub. L. No. 107–71, 115 Stat. 597 (2001)(codified in 49 U.S.C. § 114 and scattered sections of 49 U.S.C.), the Transportation Security Administration ("TSA") of the Department of Homeland Security imposed a $2.50 per passenger "enplanement" fee to pay for the costs of providing civil aviation security services. 49 U.S.C. § 44940(a)(1)(2009); 49 C.F.R. § 1510.5. Air carriers collect and remit these fees, and must allow the TSA access to their records to ensure that security service fees are being properly collected and remitted. 49 U.S.C. § 44940(e); 49 C.F.R. § 1510.19. Based on an audit of Alaska Airlines' records for a four-year period, the TSA determined that the air carrier owed $1,070,726.28 in additional passenger security fees. Alaska Airlines challenges this decision on two grounds: (1) The audit was not random and was skewed by inclusion of two flights on dates during the start and reinstitution of passenger fee collections; and (2) It is due a credit of $738,816.00 for passenger fees it paid but did not collect from passengers. Because Alaska Airlines has failed to show that the TSA's decision was arbitrary, capricious, an abuse of discretion, or contrary to law, we deny the petition for review.

**I.**

Shortly after the terrorist attacks on September 11, 2001, Congress enacted the Aviation and Transportation Security Act establishing the TSA and vesting it with primary responsibility for maintaining civil air security. 49 U.S.C. § 114. The Act required the TSA to impose "a uniform fee" on "passengers of air carriers" originating at airports in the United States to pay for the costs of providing "civil aviation security services." § 44940(a)(1). The fees are capped at $2.50 per "enplanement," defined as "a person boarding in the United States in scheduled or nonscheduled service on aircraft," 49 C.F.R. § 1510.3, and may not exceed $5.00 per one-way trip. 49 U.S.C. § 44940(c).

The Act further provides that these fees "shall be collected by the air carrier . . . that sells a ticket for transportation," and then remitted on a timely basis to the TSA. § 44940(e)(1)–(3). If a passenger fee "is not collected from the passenger, the amount of the fee shall be paid by the carrier." § 44940(d)(2). The TSA may require carriers to submit information that it determines is necessary to verify that the proper amount of fees have been timely collected and remitted. § 44940(e)(4).

Pursuant to the implementing regulations, the TSA in December 2001 set the passenger fee at $2.50. 49 C.F.R. § 1510.5. The fee applied to most flight segments originating at an airport in the United States, but passengers could not be charged more than two "enplanements" per one-way trip or four "enplanements" per round trip. *Id.* The regulations provided that the air carrier is responsible for collecting the passenger fees and remitting them to the TSA, and that the fees must be based on the passenger's air travel itinerary at the time the ticket is purchased. § 1510.9, .13. The passenger may be liable for additional fees or entitled to a refund based on a voluntary change in itinerary. § 1510.9(b). However, if the passenger is involuntarily re-routed, the air carrier is solely liable to the TSA for any additional security service fees resulting from an increase in the number of "enplanements." *Id.*

In 2006, the TSA issued a clarification regarding certain recurring issues relating to passenger fees. Letter from Michael Gambone, Acting Dir., Office of Revenue, Transp. Sec. Admin. (October 24, 2006) ("2006 clarification"). The TSA clarified both the definition of a one-way trip and its enforcement policy for additional fees when involuntary re-routes add "enplanements" to a passenger's itinerary. The TSA announced that, although air carriers were "solely liable to TSA" for such fees, it would not pursue unpaid involuntary re-route fees unless the air carrier had already collected that fee from passengers.

Further, air carriers would no longer be liable for collecting and remitting involuntary re-route fees after January 1, 2007. The 2006 clarification stated:

> All Passenger Fees collected in accordance with this clarification prior to January 1, 2007 must be remitted to TSA. Funds so remitted *and/or* collected are not subject to any refund, credit or offset against any other amounts due. (emphasis added).

Shortly before the 2006 clarification, Alaska Airlines received a letter confirming arrangements for two auditors from U.S. Customs and Border Protection to conduct a compliance audit on behalf of the TSA. Letter from Anthony Saranchak, Assistant Field Dir., Regulatory Audit Div., U.S. Customs and Border Prot., Dep't of Homeland Sec., to Brett Weiler, Tax Manager, Alaska Airlines, Inc. (August 10, 2006). The letter stated the audit would cover the period between February 1, 2002 and April 30, 2006. The methodology of the audit was straightforward: The auditors first picked twelve flights that in their judgment would best represent the entire audit period. They examined the tickets and records for those flights to determine if Alaska Airlines had in any instances failed to impose, collect, or remit the passenger security fee to the TSA. They found that out of 1,413 instances in which the fee should have been remitted to the TSA, called "qualifying flight segments," in twelve instances Alaska Airlines erroneously failed to either impose or remit the fee. The auditors then divided the number of errors (12) by the number of qualifying flight segments (1,413) to arrive at an error rate of 0.85%, and extrapolated that error rate to the total amount of fees paid during the audit period.

Based on the audit findings, the TSA assessed Alaska Airlines an additional $1,070,726.28 in passenger fees. Letter

from Pamela Pak, Revenue Compliance Manager, Transp. Sec. Admin., to Kevin Thiel, Dir. of Revenue Accounting, Alaska Airlines, Inc. (June 5, 2007). The assessment reflected a reduction of approximately half a million dollars to account for any errors caused by the air carrier's confusion about how to define a multiple one-way trip prior to issuance of the 2006 clarification. *Id*. The TSA found a recalculated sample error rate of 0.57%.

Alaska Airlines pursued administrative review on the grounds that the audit sample was not randomly drawn and so could not serve as a basis for conclusions about the entire audit period. It argued that the sample had been structured to include flights in the months immediately following initial implementation and post-suspension reimplementation of the fee,[1] and asserted that errors were more likely to occur at those times. It also claimed that it was entitled to a refund or credit of fees it had paid for passengers who were involuntarily re-routed onto additional "enplanements." Because the TSA had elected in the 2006 clarification not to enforce this liability against air carriers who had failed to remit involuntary rerouting fees, it argued the TSA was obligated to relieve it of this liability.

The TSA affirmed the additional assessment and the denial of a refund or credit. Letter from David Nicholson, Assistant Adm'r, Fin. and Admin./Chief Fin. Officer, Transp. Sec. Admin., to Brett R. Weiler, Alaska Airlines, Inc. (Oct. 19, 2008) ("Final Decision"). The TSA explained that while the flights were not randomly drawn, as the audit report had stated, the use of the auditor's professional judgment to select a representative

---

[1] *See* Emergency Wartime Supplemental Appropriations Act, Pub. L. 108–11, Title IV, 117 Stat. 604, 605 (2003); Temporary Suspension of the September 11th Security Fee and the Aviation Security Infrastructure Fee, 68 Fed. Reg. 27,747 (May 21, 2003).

sample of flights was an appropriate audit tool: "Judgmental sampling was used to ensure the data better represented the entire audit period for the air carrier." Final Decision at 2. The TSA rejected the suggestion that the sample was skewed, observing that Alaska Airlines had "offered no evidence to support its contention that the actual results were skewed in any significant way." *Id.* The TSA noted Alaska Airlines' request for administrative review did not "specifically describe the manner and extent of the purported skewed results" but "merely speculated that the auditors' choice of samples was against its interests." *Id*. Therefore, "[l]acking any real evidence of the alleged skewed results, we see no reason to make any adjustments to the methodology." *Id*. Regarding the refund or credit, the TSA explained the 2006 clarification had "clearly indicated" that "no refund, credit or offset . . . would be provided where an air carrier had correctly collected and remitted" such fees and that it had authority to retain such fees remitted before it suspended enforcement of the regulatory requirement in 2006. *Id*. at 2–3. Alaska Airlines petitions for review.

**II.**

Alaska Airlines contends that the auditors' non-random selection of the flights to audit was based on the higher potential for passenger fee collection errors in certain time periods and thus caused the error rate to be overstated. Specifically, it maintains that out of only twelve flights examined, two were selected because the auditors assumed there would be a higher than normal incidence of error when the air carrier was instituting or reinstituting its collection and remittance proceedings. It maintains that the sampling methodology thus improperly extrapolated this allegedly higher error rate over the entire fifty-one months under review.

Our review is limited to determining whether the TSA acted arbitrarily or capriciously, abused its discretion, or acted contrary to law. *Boca Airport, Inc. v. FAA*, 389 F.3d 185, 189 (D.C. Cir. 2004); 5 U.S.C. § 706(2)(A); 49 U.S.C. § 46110; *see also Southwest Airlines v. Transp. Sec. Admin.*, 554 F.3d 1065, 1069, 1073 (D.C. Cir. 2009). Because agency determinations receive "an extreme degree of deference [when] they involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise," *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007)(internal quotation marks omitted), Alaska Airlines must demonstrate that the audit methodology accepted by the TSA was so flawed that the audit findings on which the TSA relied bore "no rational relationship to the characteristics of the data to which it is applied," *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001). This it fails to do.

Alaska Airlines' technical objection to the use of non-random judgmental sampling is unfounded. The use of such sampling is an accepted tool among auditors and a recognized means of drawing an appropriately representative sample of the population under study. *See* American Institute of Certified Public Accountants, AICPA PROFESSIONAL STANDARDS, AU § 350.03–.04, .39 (1995). As the TSA noted, Alaska Airlines presented no expert evidence challenging the use of judgmental audits.

Alaska Airlines' assertion that the audit sample was skewed toward flights likely to have a high error rate is also unsupported by record evidence. The auditors' methodology drew a broad and varied sample, examining more than 1,400 passenger flight segments serving airports throughout Alaska Airlines' route system and drawn from dates throughout the audit period. This is consistent with the requirement that "[w]henever sampling is

used in an audit . . . sample items [must] be selected in such a way that they can be expected to be representative of the population from which they are drawn. . . . If each item in a population or subpopulation has a chance (not necessarily an equal chance) of being selected, the resulting sample is potentially representative of the characteristics contained in the population or subpopulation." VINCENT M. O'REILLY ET. AL, MONTGOMERY'S AUDITING 315 (11th ed. 1990) (hereinafter "MONTGOMERY'S AUDITING"). Alaska Airlines presented to the TSA no contrary expert opinion or auditing standard.

The unstated assumption underlying Alaska Airlines' challenge is that random selection is the only feasible means of obtaining a sample that fairly represents the audited population and that any other methodology is invalid for purposes of deriving conclusions about the population as a whole. However, the record shows that the TSA engaged auditors with expertise in the appropriate design of audit investigations and the evaluation of audit data. The TSA responded to Alaska Airlines' challenges by explaining that the sampling was an "appropriate audit tool" that provided an adequate basis for the auditors' conclusions. Final Decision at 2.

The only basis offered by Alaska Airlines for suggesting that the expert judgment of the auditors was flawed is the assertion of its Tax Manager, Brett T. Weiler, that during discussion of the audit "[he] was told that a flight conducted during the initial implementation of the fee and at the restart of the fee would be included in the sample because that is where collection errors would most likely occur." Letter from Brett T. Weiler, Tax Manager, Alaska Airlines, Inc., to Patrick McCracken, U.S. Dep't of Homeland Sec. (Dec. 14, 2006). The TSA considered this assertion and concluded, in light of its requirement that auditors conform to professional standards of independence and impartiality, that the Tax Manager must have

misunderstood the auditor. Final Decision at 2; *see also* American Institute of Certified Public Accountants, AICPA PROFESSIONAL STANDARDS, AU § 220 (1995). The TSA explained: "[T]he auditor did not say particular flights were selected to potentially identify an increased number of errors. The auditor simply discussed that the goal in applying the methodology was to select a representative sample and to review sample items for compliance with the specific laws and regulations." Final Decision at 2. Viewed as a matter of credibility, the court will generally defer to the factfinder's evaluation. *E.g., King Elec., Inc. v. NLRB*, 440 F.3d 471, 475 (D.C. Cir. 2006). But there is a further problem for Alaska Airlines: It offered neither expert opinion nor empirical evidence to support its assertion that the audit was impermissibly skewed.

Three types of errors were found by the auditors: (1) incorrect categorization of a collected fee as a domestic tax and resulting failure to remit that fee; (2) failure to identify multiple one-way trips; and (3) failure to impose the fee on all qualifying flight segments of a round trip itinerary. Without pointing to record evidence, Alaska Airlines assumes that more errors occurred during the months immediately following the institution and reinstitution of the passenger fees than during other months. Although it had access to its own records, it presented no evidence to the TSA that the error rate for those two particular flights in the sample was higher than for flights at other times. Its attempt on appeal to make up for the absence of record evidence by relying on precedent involving the sentencing of criminal defendants misses the mark, for that precedent supports the auditor's approach of ensuring that the sample was fairly representative of the activity during the audit

period.[2]  Likewise its citation to MONTGOMERY'S AUDITING in its reply brief not only comes too late but fails to demonstrate that the audit methodology resulted in findings that bore "no rational relationship to the characteristics of the [flight] data." *Appalachian Power Co.*, 249 F.3d at 1052.  Rather, the section of MONTGOMERY'S AUDITING on which Alaska Airlines now relies states only that sample items should be selected from the whole population in order to be representative. MONTGOMERY'S AUDITING at 279, 315–17.

The record evidence shows that the auditors' sampling methodology drew broadly from flights in every year during the audited period and that the sampling was designed to select a fairly representative sample of the audited population.  The TSA's rejection of Alaska Airlines' assertion of deliberate bias in the sample selection is supported by substantial evidence, and Alaska Airlines has not supported its assertion with expert or empirical evidence that the errors found by the auditors were peculiar to flights during the start-up or reinstitution periods.  To the extent Alaska Airlines now suggests the sample of flights was too small, it did not raise this issue before the TSA and offers no excuse for not doing so; that argument is forfeited.  49 U.S.C. § 46110(d); *see also ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007).  Consequently, having failed to support its challenge to the audit methodology based on the non-random selection of the twelve flights by either expert opinion

---

[2]  *See, e.g., United States v. Culps*, 300 F.3d 1069 (9th Cir. 2002)(holding that a district court must base estimates on demonstrably representative instances); *United States v. Rivera-Maldonado*, 194 F.3d 224 (1st Cir. 1999)(remanding for resentencing where district court's estimates were clearly miscalculated and not representative); *United States v. Johnson*, 185 F.3d 765 (7th Cir. 1999)(holding that district court's estimate must be based on rigorous analysis and representative evidence rather than guesswork).

or empirical evidence, Alaska Airlines has failed to show the TSA's decision to adhere to the audit methodology was arbitrary or capricious, an abuse of discretion, or contrary to law.

**III.**

Alaska Airlines challenges the denial of its request for a credit on the ground that the TSA failed to consider that Alaska did not collect the fees from passengers.[3] In the Final Decision the TSA stated: "[The] TSA clearly indicated in the October 24, 2006 clarification . . . that no refund, credit or offset against any other amounts due would be provided where an air carrier had correctly collected and remitted liabilities arising from involuntary re-routes." Final Decision at 2–3. Alaska Airlines points out that it did not collect involuntary re-route fees from its passengers but paid them itself.

The 2006 clarification interpreted 49 C.F.R. § 1510.9, which provides that the air carrier is "*solely* liable to TSA for additional security service fees imposed because of involuntary enplanement changes to the itinerary" (emphasis added). Inclusion of the "and/or" phrase in the 2006 clarification indicates that the policy change was narrower than Alaska Airlines suggests. Because the TSA incorporated the 2006 clarification, its Final Decision rejecting the requested credit is fairly read in keeping with the text of the clarification. The explanation of the reasons for the policy change demonstrates the TSA understood that involuntary re-route fees were frequently paid out of the air carrier's own funds. *See* 2006

---

[3] Alaska Airlines no longer claims entitlement to a credit based on a challenge to the enforcement policy set forth in the 2006 clarification. *See* Pet'r's Reply Br. 25; Oral Argument Tape of Oct. 20, 2009 at 28.50–28.56. We therefore treat as abandoned those portions of its brief.

Clarification at 3. As some air carriers had collected involuntary re-route fees from passengers, the TSA decided that those fees must be remitted to the TSA notwithstanding the prospective change in its enforcement policy. *Id.* The TSA's decision to pursue only fees collected from passengers did not modify its policy that the TSA would not credit or return corporate funds that had already been remitted for involuntary re-routes.

Alaska Airlines' objection that the denial of a credit is inconsistent with the TSA's refund policy also fails. That refund policy authorized refunds to the air carrier where it was obligated to refund the fee to a passenger who never used the purchased ticket and thus did not ultimately incur a fee liability. Letter from Randall Fiertz, Acting Dir. of Revenue, Transp. Sec. Admin., to James A. Hultquist, Managing Dir., Taxes, Air Trans. Ass'n (Nov. 21, 2002). The TSA could reasonably distinguish between circumstances in which security service fees were previously due and those in which no fees had ever been incurred.

Accordingly, we deny the petition for review.