NATHAN KATZ REALTY, LLC,
et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 00–1238.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 2001.

Decide June 12, 2001.

Before: WILLIAMS, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Nathan Katz Realty, LLC manages thirty apartment buildings in Queens, New York. After Local 32B–32J, Service Employees International Union, AFL–CIO ("the Union") petitioned to organize Katz's service employees, a National Labor Relations Board ("NLRB") Regional Director determined that the employees constituted two separate units and ordered that the two elections be held on the same day at different times. The Director also found that the superintendents in Katz's buildings were not supervisors under the National Labor Relations Act ("NLRA").

In one of the two elections, the employees voted to be represented by the Union. Following the election, Katz filed several objections, contending *inter alia* that (1) agents of the Union had improperly interfered with the election by being present in a no-electioneering zone directly outside the entrance of the election site, and (2) the Regional Director erred in deciding not to count the ballots from the first election until after the second election was completed. The Regional Director overruled Katz's objections, and his decision was affirmed by the Board.

When Katz refused to bargain with the Union, the Board's General Counsel filed a complaint alleging that Katz's refusal was an unfair labor practice that violated § 8(a)(5) and (1) of the NLRA. 29 U.S.C. § 155(a)(5), (1). Katz responded to the complaint by renewing its earlier objections, incorporating them by reference in a letter to the Board. The Board ultimately ruled that Katz had engaged in unfair labor practices and ordered it to bargain

G. Peter Clark argued the cause and filed the briefs for petitioners.

Ruth Burdick, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the briefs were Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Supervisory Attorney.

with the Union. *See Nathan Katz Realty LLC,* 331 N.L.R.B. No. 22 (May 23, 2000).

Katz petitions us to review the Board's decision, again arguing that its superintendents are supervisors, the Union's agents engaged in improper conduct during the election, and the Director erred by refusing to count the first ballots before the second election began. In a cross-application for enforcement of its order, the Board contends that these issues are not properly before us because Katz failed to preserve them in the underlying representation case.

For reasons more fully set out below, we conclude that Katz properly preserved all of the issues it raises in its petition. Furthermore, we hold that the Board failed to provide a reasoned basis for concluding that the Union's agents did not interfere with the election and for deciding to delay tallying the ballots cast in the first election. Accordingly, we grant Katz's petition in part and remand the case for further proceedings.

## I. BACKGROUND

In the spring of 1999, the Union petitioned the NLRB seeking an election among Katz's superintendents and porters to permit the Union to become their bargaining representative. Following a hearing, the NLRB Regional Director found that the employees of all the buildings but one constituted an appropriate unit ("multi-site unit"). The employees of the other building comprised a separate unit ("Sima unit"). The Regional Director scheduled the two units' representation elections for the same day, with the Sima election in the morning and the multi-site election in the afternoon.

In his Decision and Direction for Election, the Director concluded that the buildings' superintendents were not supervisors under the NLRA. *See* 29 U.S.C. § 152(11). Specifically, the Director determined that "[a]t most, superintendents possess some low-level authority to assign and oversee the porters, but without using independent judgment and without exercising any real supervisory authority over their employment status." *Nathan Katz Realty, LLC,* No. 29–RC–9265, slip op. at 19 (July 1, 1999). The superintendents therefore were included in the units. Katz challenged this ruling, but the Board summarily affirmed it. *See Nathan Katz Realty, LLC,* No. 29–RC–9265 (July 26, 1999).

Two and a half weeks before the elections, the Union requested that the Regional Director not count the ballots from the Sima election until the voting in the multi-site election was over. Although Katz objected, the Regional Director granted the Union's request, asserting that "[t]o count the ballots in both units simultaneously guarantees that neither party will enjoy an unfair advantage over the other based on the result of the election in the SIMA unit." Letter from Alvin Blyer, Regional Director, NLRB, to G. Peter Clark, Counsel for Nathan Katz Realty, LLC (July 16, 1999).

On the day of the elections, the two employees composing the Sima unit voted against the Union, but the Union succeeded in the multi-site election, receiving 21 of 40 employee votes. Following the elections, Katz filed three objections: (1) Union agents interfered with the elections by stationing themselves in a no-electioneering zone during the voting; (2) the Union provided a substantial benefit to Katz's employees by providing them with cellular phones during the period leading up to the elections; and (3) the Director interfered with the multi-site election by refusing to count the Sima ballots until after the multi-site election. The Director dismissed objection number three and most of the allegations in objection number one with-

out a hearing. Their dismissal was summarily affirmed by the Board. *See Nathan Katz Realty, LLC,* No. 29–RC–9265 (Oct. 1, 1999). The Director later dismissed objection number two and the remaining allegation in objection number one.

After the Union was certified, it sought to bargain with Katz, but Katz refused. The NLRB General Counsel filed a complaint alleging that Katz's refusal constituted an unfair labor practice. When the General Counsel filed a motion for summary judgment, the Board issued a notice to show cause to Katz. After Katz responded to the notice, the Board found that Katz had engaged in unfair labor practices in violation of § 8(a)(5) and (1) of the NLRA. *See Nathan Katz Realty LLC,* 331 N.L.R.B. No. 22 (May 23, 2000).

Katz petitions this Court for review of the Board's unfair labor practice decision. In its petition, Katz reasserts its arguments that (1) the buildings' superintendents are supervisors as defined by the NLRA, (2) the Union's agents interfered with the elections through their presence in a no-electioneering zone during the voting, and (3) the Regional Director interfered with the multi-site election by refusing to count the Sima ballots until after both elections were completed. The Board filed a cross-application for enforcement of its order.

## II. ANALYSIS

### A. Jurisdiction

The Board contends that the issues raised by Katz are not properly before the Court. Specifically, the Board argues that Katz did not explicitly preserve the issues it had presented in the underlying representation proceeding in accordance with § 10(e) of the NLRA. 29 U.S.C. § 160(e). In its response to the Board's notice to show cause in the unfair labor practice proceeding, Katz wrote that it

relies upon its Answer to the Complaint in Case 29–CA–23280, the entire record in the related representation case, Case 29–RC–9265, including the September 21, 1999 *Request for Review on the Acting Regional Director's Supplemental Decision On Objections On Behalf Of Nathan Katz Realty, LLC,* and the transcripts and records of the proceedings before the hearing officers on the petition and on the election objections, in opposition to General Counsel's Motion for Summary Judgment in the above-referenced cases.

Letter from G. Peter Clark, Counsel for Nathan Katz Realty, LLC, to John J. Toner, Executive Secretary, NLRB (Apr. 18, 2000). The Board suggests that this statement was insufficient to provide it with adequate notice that Katz intended to pursue specific issues in its petition for review.

■ Section 10(e) provides that "[n]o objection, that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Accordingly, a "Court of Appeals lacks jurisdiction to review objections that were not urged before the Board." *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982). The critical inquiry in evaluating the Court's jurisdiction to review an objection is "whether the Board received adequate notice of the basis for the objection." *Alwin Mfg. Co. v. NLRB,* 192 F.3d 133, 143 (D.C.Cir.1999) (internal quotation omitted).

■ Under the Board's regulations, once a party litigates an issue in a representation proceeding, it is prohibited from relitigating those same issues in a subsequent unfair labor practice proceeding.

See 29 C.F.R. § 102.67(f); *see also Joseph T. Ryerson & Son, Inc. v. NLRB*, 216 F.3d 1146, 1151 (D.C.Cir.2000). In light of the no-relitigation rule, Katz contends that its statement provided the Board with sufficient notice that it intended to raise the same issues in its petition for review that it previously had raised in the representation proceeding. Katz claims that forcing a party to reargue its representation and election challenges would serve no legitimate purpose.

■ Last year, in *Alois Box Co. v. NLRB*, we agreed that a petitioner does not need "to provide yet *another detailed notice* of the issues which have already been presented to the Board in the representation cases" when it is responding to a later unfair labor practice charge. 216 F.3d 69, 77 (D.C.Cir.2000) (internal quotation omitted). We explained, however, that when a petitioner completely fails to raise an issue during an unfair labor practice proceeding, "the Board was entitled to treat the issue as abandoned," and the petitioner "has forfeited its right to challenge the Board's disposition ... in the representation proceeding." *Id.* at 77, 78. Because the *Alois Box* petitioner neglected to even reference the contested issue during the unfair labor practice proceeding, we declined to decide "what would provide sufficient notice" to preserve an issue for judicial review. *Id.* at 78. That question is now squarely before us.

This question has been presented in two of our sister circuits, the Ninth and Second. In *NLRB v. Best Products Co.,* the petitioner sought to preserve its election objections during an unfair labor practice proceeding by stating that it "incorporates by reference and reaffirms by reference its post election objections and brief." *See* 765 F.2d 903, 909 (9th Cir.1985). The Ninth Circuit held that this statement was sufficient to preserve the objections for judicial review. *See id.* Specifically, the Ninth Circuit ruled that a party can preserve an issue by providing a "firm indication to the Board of the objecting party's non-abandonment of the issue." *Id.* at 910.

In contrast, the petitioner in *Schnurmacher Nursing Home v. NLRB* sought to preserve arguments it had made in a representation case by stating during a later unfair labor practice proceeding that it "disputes the ... other findings as set forth in [its] Request for Review" of the Regional Director's representation decision. 214 F.3d 260, 270 n. 3 (2d Cir.2000). This statement appeared in a footnote in the petitioner's response to a summary judgment motion in the unfair labor practice proceeding. *See id.* Describing the petitioner's statement as "cryptic," the Second Circuit held that it was insufficient to preserve the issues for judicial review. *Id.* Although the *Schnurmacher Nursing Home* court did not provide any substantive analysis in arriving at its conclusion, it did cite two cases. Those cases, however, do not support the court's holding.

First, the Second Circuit cited the Supreme Court's decision in *Marshall Field & Co. v. NLRB*, specifically referencing the Court's statement that a " 'general objection [to "each and every recommendation" of a trial examiner's report] did not apprise the Board that petitioner intended to press the question now presented.' " *Id.* (quoting 318 U.S. 253, 255, 63 S.Ct. 585, 87 L.Ed. 744 (1943) (per curiam)). This statement, however, is simply dicta, drawn out of its original context. The *Marshall Field* Court expressly decided as it did because it could not "find that, *at any stage of the proceedings before the Board,* the objection now urged ... was presented to it or to any member or agent of the Board." 318 U.S. at 255, 63 S.Ct. 585 (emphasis added).

Second, the *Schnurmacher Nursing Home* court cited *NLRB v. Star Color Plate Service* to note in a parenthetical that "raising [an] issue in [a] representation proceeding does not suffice to preserve it on review of [an] order in [a] related unfair labor practice proceeding." *Schnurmacher Nursing Home*, 214 F.3d at 269 n. 3 (citing 843 F.2d 1507, 1510 n. 3 (2d Cir.1988)). This parenthetical does not by itself support the *Schnurmacher Nursing Home* conclusion. It does, however, support the unremarkable basis for the *Star Color* ruling. The *Star Color* court held that it lacked jurisdiction to consider the specific issue raised by petitioner on judicial review. This holding followed from the fact that the issue "was raised in the original representation proceeding," but *"was not raised in the unfair labor practice proceeding."* 843 F.2d at 1510 n. 3 (emphasis added).

■ Neither *Star Color* nor *Marshall Field* compels the Second Circuit's ruling in *Schnurmacher*. Indeed, together these cases stand simply for the rule that we articulated in *Alois Box*—the Board may treat as abandoned any issue not raised in an unfair labor practice proceeding. Accordingly, we do not find *Schnurmacher Nursing Home* persuasive.

■ We are persuaded instead to follow the Ninth Circuit's approach: "A firm indication to the Board of the objecting party's non-abandonment of the issue is generally adequate to preserve it for our review." *Best Products Co.*, 765 F.2d at 910. In light of the no-relitigation rule, a detailed restatement of the arguments raised during representation proceedings or in election objections would be futile. *See id.* Section 10(e) ensures that the Board has an opportunity to entertain questions that parties will later ask appellate courts to review. *See Marshall Field*, 318 U.S. at 256, 63 S.Ct. 585. To meet this objective, we consider whether a party has

given the Board adequate notice of the basis for its objection, *see Alois Box*, 216 F.3d at 78, and that it "intends to press the specific issue it now raises" on appeal, *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 350, 73 S.Ct. 287, 97 L.Ed. 377 (1953). When the Board already has had an opportunity to consider an issue in an earlier proceeding, the party simply needs to provide a firm indication that it has not abandoned the issue in a later unfair labor practice proceeding. As in this case, incorporating earlier arguments by reference generally provides the Board with adequate notice.

■ Katz responded to the NLRB General Counsel's motion for summary judgment by stating that it relied upon "the entire record in the related representation case, Case 29–RC–9265, including the September 21, 1999 *Request for Review on the Acting Regional Director's Supplemental Decision On Objections On Behalf Of Nathan Katz Realty, LLC.*" Letter from G. Peter Clark, Counsel for Nathan Katz Realty, LLC, to John J. Toner, Executive Secretary, NLRB (Apr. 18, 2000). This reference to the representation case is sufficiently specific to preserve the issues Katz raises for judicial review. In the underlying representation proceeding, Katz had appealed three issues to the Board, including whether its superintendents are supervisors. In the September 21 *Request for Review,* Katz appealed only two objections to the Board: whether Union agents had engaged in improper electioneering and whether the Director erred in not counting the Sima election ballots until the multi-unit election was completed. These are the same issues it now asserts in its petition to this Court.

Indeed, in the decision now under review, the Board noted that Katz "attacks the validity of the certification on the basis of its objections to the election and the

Board's unit determination in the representation proceeding." *Nathan Katz Realty*, 331 N.L.R.B. slip op. at 1. Given this statement, we are astounded that the Board now argues that it did not receive sufficient notice concerning the three issues Katz raises in its petition. The only "objections to the election" Katz appealed to the Board were the two addressed in the September 21 *Request for Review*. Likewise, the supervisor issue is one of only two substantive issues Katz appealed to the Board concerning the "unit determination." Katz's response to the summary judgment motion gave a firm indication that it was not abandoning the issues it had previously raised, and therefore unquestionably provided the Board with sufficient notice.

The Board raises the alarming specter that greater specificity is "fundamental" to its "fair and expedient administration" of the NLRA. Brief for the NLRB at 15. If the Board is so seized with concern about this question, it simply could issue a rule requiring more specific objections. We should not have to point out that such a rule would govern an internal procedure. It therefore would not be subject to notice and comment. *See* 29 U.S.C. § 156; 5 U.S.C. § 553. In fact, the Board could easily promulgate such a rule at any time. In the future, we expect the Board will pursue that option rather than crying out to the court for help.

The Board was afforded two opportunities to pass on each of the issues Katz raises in its petition. On both occasions, the Board summarily affirmed the Regional Director's rulings. Section 10(e) has not been threatened in this case. We therefore turn to the merits of Katz's petition.

### B. Superintendents as Supervisors

Katz employs two property managers who each oversee fifteen of its apartment buildings. The buildings are staffed by superintendents and porters. At the pre-election hearing, Katz argued that its superintendents should be designated as supervisors under the NLRA. The Regional Director found that they were not supervisors, and the Board affirmed this finding. In its petition for review, Katz contends that the superintendents are supervisors because they effectively discipline the porters, make hiring recommendations, assign work to porters, set porters' schedules, and recommend wage increases. Katz further contends that this conclusion is mandated by a previous Board ruling, *Planned Bldg. Servs., Inc.*, 318 N.L.R.B. 1049, 1059–61 (1995), in which a superintendent for other New York City apartments was found to be a supervisor.

■ We will uphold the Board's determination of whether an employee is a supervisor as long as it is in accordance with law, supported by substantial evidence, and is the product of reasoned decision-making. *See Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 276 (D.C.Cir.2001). In light of its expertise, we accord the Board "a large measure of informed discretion" in making this determination. *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1550 (D.C.Cir.1984) (internal quotation omitted). The burden of proving that an employee is a supervisor must be carried by the party asserting it. *See NLRB v. Ky. River Cmty. Care, Inc.*, —— U.S. ——, at —— – ——, 121 S.Ct. 1861, —— L.Ed.2d —— (2001); *Beverly Enters.–Mass., Inc. v. NLRB*, 165 F.3d 960, 962 (D.C.Cir.1999).

Employees who are supervisors are excluded from the NLRA's protection. *See* 29 U.S.C. § 152(3). The NLRA defines "supervisor" as:

[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline

other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. *Id.* § 152(11). As this Court has explained before, under the statute, "the employee must possess at least one of the twelve types of authority set out in the statute, the exercise of that authority must require the use of independent judgment, and the authority must be held in the employer's interest." *VIP Health Servs., Inc. v. NLRB,* 164 F.3d 644, 648 (D.C.Cir.1999). Whether an employee exercises independent judgment is an inquiry into "the degree of discretion exercised with respect to the statutory indicia of supervisory status. If an individual's discretion . . . is tightly constrained, then her exercise of that authority is 'routine. . . .'" *Beverly Enters.-Penn., Inc. v. NLRB,* 129 F.3d 1269, 1270 (D.C.Cir.1997) (per curiam) (mem.). In this case, the Board's determination that Katz's superintendents are not supervisors is supported by substantial evidence and is the product of reasoned decisionmaking.

■ Katz avers that the "most notable exercise of a superintendent's supervisory authority is found in the area of discipline." Brief for Petitioners at 29. Katz claims that its evidence demonstrates that the superintendents effectively discipline porters—or at least effectively recommend discipline. Although the record includes testimony that superintendents theoretically could discipline porters, Katz offered no evidence that a superintendent ever actually had disciplined a porter. One of Katz's property managers testified that a superintendent could suspend a porter for hitting a tenant, but the manager acknowledged that he had never talked with any superintendent about this alleged authority. Without specific evidence that any superintendent had disciplined a porter,

we cannot possibly conclude that the Regional Director erred.

A Katz property manager also testified that superintendents could make recommendations on discipline, but "the kind of option I'm taking will be my decision." This assertion does not establish that any superintendent had in fact effectively recommended discipline. Indeed, the record reflects that Katz failed to offer any evidence that a superintendent's recommendation had "resulted in an adverse personnel action." *Beverly Enters.-Penn.,* 129 F.3d at 1270. Although Katz did proffer testimony that a superintendent informed a property manager that a porter "wasn't doing a good job," "mere reporting is insufficient to establish that [employees] effectively recommend discharge or discipline." *VIP Health Servs.,* 164 F.3d at 648. Accordingly, we hold that the Regional Director's determination is supported by substantial evidence.

■ Katz's other arguments concerning superintendents' supervisory authority do not fare any better. First, Katz claims that superintendents effectively recommend hiring porters. Yet, Katz failed to offer any evidence that superintendents have in fact made such effective recommendations, except in the case of one superintendent who recommended his wife for a job. As the Board has ruled in the past, "[i]t is scraping the bottle [sic] to argue that . . . recommendations of members of his family . . . prove the supervisory status contemplated in the Act." *Pierre Pellaton Enters., Inc.,* 201 N.L.R.B. 409, 412 (1973). Absent evidence of other effective recommendations, Katz cannot carry its burden of proof, much less show that the Regional Director's decision is not supported by substantial evidence.

Second, Katz contends that superintendents assign work to porters. Those assignments, however, are generated from

tenant requests. When the Board has found that a superintendent exercises independent judgment in assigning work, the Board has relied on specific evidence of that judgment. For example, in *Planned Building Services*, the NLRB's decision was based on evidence showing that the employee in question "transfer[red] porters and handymen from one assignment and between buildings depending on the presence of emergencies which would periodically arise and his judgment as to their urgency." 318 N.L.R.B. at 1060. Although Katz claims that its superintendents exercise independent judgment by balancing "conflicting demands" in assigning work, Brief for Petitioners at 30, there is no evidence in the record to support its claim. As the Board has aptly explained in the past, a superintendent's "point[ing] out the type and location of work to be done" and transmitting "a tenant's request" are "of no great[ ] consequence." *Pierre Pellaton*, 201 N.L.R.B. at 412.

Third, despite Katz's assertions, the record contains no evidence that superintendents set porters' schedules or approve vacation requests. Even if they ·did set the schedules, Katz offered no evidence that the superintendents have "substantial autonomy" in creating the schedules or that they exercise independent judgment in creating the schedules. *Micro Pac. Dev., Inc. v. NLRB*, 178 F.3d 1325, 1331 (D.C.Cir.1999). In contrast, the petitioner in *Micro Pacific* demonstrated that its housekeeping supervisors relied on a number of specific factors "to make independent determinations in scheduling and assigning the employees." *Id.*; *see also Beverly Enters.-Penn.*, 129 F.3d at 1270 (explaining that licensed practical nurses "have no authority to schedule [certified nursing assistants] on any given day or week").

Fourth, Katz claims its superintendents recommend wage increases. This claim is centered on a property manager's testimony that a superintendent "can recommend" such an increase. The manager testified, however, that no superintendent ever had recommended to him that a porter receive a raise and that he did not know of any superintendent ever actually making a wage recommendation. There is simply no specific evidence to support Katz's claim.

Finally, Katz argues that the Board's determination in this case conflicts with an earlier ruling in which the Board concluded that a superintendent for several New York City apartment buildings was a supervisor. *See Planned Bldg. Servs.*, 318 N.L.R.B. at 1059–61. In *Planned Building Services*, the Board ruled that a "senior superintendent" was a supervisor because he exercised independent judgment in a number of areas. *See id.* at 1060. Specifically, the Board reviewed extensive evidence detailing the senior superintendent's assigning work, disciplining employees, allowing employees to leave work early, and screening employment applications. *See id.*

In *Planned Building Services*, the Board did not claim to establish a per se rule concerning superintendents in New York City apartments. Rather, it concluded that "other superintendents" in the same buildings were not supervisors. *Id.* "[T]he issue of supervisory status is heavily fact-dependent" and is not subject to a blanket determination based on the class of the job in question. *Brusco Tug & Barge*, at 276. Here, Katz's evidence did not come close to proving that its superintendents possess the same responsibility as the *Planned Building Services* senior superintendent. Accordingly, the Board did not err in finding that Katz's superin-

tendents are not supervisors under the NLRA.

### C. Election Interference by Union Agents

The multi-unit election was held at a single, central location: a classroom in a Lutheran church. According to Katz, "[t]o reach the polling place, voters needed to open a gate at the edge of the 41st Avenue sidewalk and walk about ten feet to the side door of the Church building, open the door and enter the building." Brief for Petitioners at 10–11. Two of Katz's managers and several of its employees alleged that during the election two Union agents were in a car parked within twenty feet of the church's side door. According to Katz's managers and employees, the Union agents motioned, gestured, and honked at the employees as they passed the car.

After the election, Katz filed an objection based on these incidents. In its objection, Katz alleged that the Board Agent had established a 25–yard no-electioneering zone outside the entrance of the church. Katz argued that the Union agents' presence and actions in the no-electioneering zone constituted objectionable conduct that justified setting aside the election. The Regional Director overruled Katz's objection, concluding that the allegations—even if true—were insufficient to demonstrate that the Union had "interfered with the exercise of the employees' free choice." *Nathan Katz Realty, LLC,* No. 29–RC–9265, slip op. at 9 (Sept. 8, 1999) ("Supplemental Decision"). The Board summarily affirmed the Director's conclusion.

■ We will uphold Board decisions concerning election objections if they are the product of reasoned decisionmaking and supported by substantial evidence. *See Family Serv. Agency S.F. v. NLRB,* 163 F.3d 1369, 1377 (D.C.Cir.1999). In Board proceedings, the party seeking to overturn a representation election maintains the burden of establishing "that the election was not fairly conducted." *Id.*

In previous cases, we have recognized the NLRB's *Milchem* rule, which prohibits "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots," regardless of the content of the remarks. *Milchem, Inc.,* 170 N.L.R.B. 362, 362 (1968). When this rule is violated, "the Board will order a new election." *Family Serv. Agency,* 163 F.3d at 1381.

"When an employer objects to electioneering not encompassed within the *Milchem* rule"—that is, when the alleged objectionable conduct occurs at a time other than while voters are waiting to cast ballots in the designated voting area—"the Board will overturn the election only if the electioneering substantially impaired the exercise of free choice." *Overnite Transp. Co. v. NLRB,* 140 F.3d 259, 270 (D.C.Cir. 1998) (internal quotation omitted). In conducting this inquiry, the Board considers a range of factors, including the "nature and extent of the electioneering, whether it happened within a designated 'no electioneering' area, whether it was contrary to the instructions of the Board's election agent, whether a party to the election objected to it, and whether a party to the election engaged in it." *Id.*

In this case, the Regional Director assumed that all of the allegations contained in Katz's election objection were true. Accordingly, Katz's allegations establish that (1) the Union agents' conduct occurred in a no-electioneering zone; (2) their presence and actions were contrary to the instructions of the Board Agent; (3) Katz objected to the Union agents' conduct; and (4) the people who engaged in the conduct were agents of a party to the election. The Regional Director concluded that "[a]lthough the [Union agents] may have

been stationed within the designated no-electioneering zone area for a portion of the polling period, there is no suggestion that they actually engaged in any electioneering" nor that "they engaged in objectionable conduct sufficient to set aside the election." Supplemental Decision at 9–10. The Director is correct that Katz has not introduced evidence of direct electioneering by the Union agents; however, in previous cases, the Board has stated that a party's mere presence may be sufficient to justify setting aside an election. Katz cites two such cases: *Performance Measurements Co.*, 148 N.L.R.B. 1657 (1964), and *Electric Hose & Rubber Co.*, 262 N.L.R.B. 186 (1982).

In *Electric Hose*, the Union lodged two election objections directly relevant to the case now before us. First, it objected to the presence of a company supervisor within ten or fifteen feet of the entrance to the voting area. *See Elec. Hose*, 262 N.L.R.B. at 216. Second, the Union objected to the presence of two supervisors who stood in areas where employees "had to pass in order to vote." *Id.* The Administrative Law Judge not only found that the first supervisor had engaged in objectionable conduct, but she also concluded that the two supervisors' "unexplained presence" alone was "coercive evidence of such a nature as to have destroyed the laboratory conditions necessary for the conduct of a free and fair election." *Id.* According to the ALJ, the only plausible purpose for the supervisors' presence, like the lone supervisor's presence near the entrance to the voting area, was "to convey to [the voting] employees the impression that they were being watched." *Id.* The Board adopted these conclusions. *See id.* at 186.

The Regional Director attempted to distinguish *Electric Hose* from this case by noting that here the Union agents were stationed in a car outside the church, not

"immediately outside of the actual polling area." Supplemental Decision at 10 n.12. This distinction is manifestly inadequate. In *Electric Hose*, only one of the supervisors stood immediately outside the polling area. The other two supervisors simply stood in an area where employees "had to pass in order to vote." Nothing in the *Electric Hose* decision indicates that these two supervisors were anywhere near the actual polling place. Katz alleges that, like the employees in *Electric Hose*, the multi-site employees had to pass the Union agents on their way to vote. In Katz's election objection, it specifically alleged that "[a] voter approaching the Church entrance on the sidewalk (the only means of access) would have to walk within a few feet of the car." Similarly, several Katz managers stated in their affidavits that "[a]nyone in the car could easily watch the side doorway to the Church and the sidewalk along 41st Avenue leading to that entrance used for the NLRB election." The Regional Director simply did not attempt to explain why the presence of the Union agents should be treated differently than the "unexplained presence" of the two *Electric Hose* supervisors.

In *Performance Measurements*, the employer's president "stood by the door to the election area so that it was necessary for each employee who voted to pass within 2 feet of him to gain access to the polls." 148 N.L.R.B. at 1659. The Regional Director in that case found that there was no evidence that the president engaged in any electioneering. Nevertheless, the Board held that the president's "continued presence" constituted "improper conduct" that "interfered with employees' freedom of choice in the election." *Id.*

In this case, the Regional Director distinguished the Union agents' actions by stating that they "were stationed near the outside entrance to the building, not the

entrance to the church basement class-room where the actual voting took place." Supplemental Decision at 10 n.12. This is a hollow distinction. After all, according to Katz's election objection, which the Regional Director assumed to be true, the Board Agent established a no-electioneering zone. No such zone existed in *Performance Measurements*. The Director did not explain why the Union agents' "continued presence" in a no–electioneering zone by the entrance to the site of the election (where employees had to pass) is different from standing outside the room in which employees actually vote. Standing in either place could "interfere with the employees' freedom of choice"—particularly if the Board Agent enacted a no–electioneering zone, presumably to prevent the parties from interfering with that freedom.

The Regional Director also distinguished *Performance Measurements* by stating that "there is no evidence to suggest that employees were required to pass the [Union agents] in order to enter the building." *Id.* As we explained above, this statement is simply false. The Director purported to assume that Katz's allegations were true, yet discounted—without explanation—its allegation that employees were required to pass the Union agents.

 Together, *Electric Hose* and *Performance Measurements* seem to stand for the proposition that a party engages in objectionable conduct sufficient to set aside an election if one of its agents is continually present in a place where employees have to pass in order to vote. In light of these cases, Katz's allegations appear to establish that the Union agents' presence outside the church's entrance constitutes conduct of such a nature that it substantially impaired the multi-site employees' exercise of free choice—even if the agents did not actually talk to any employee. The Board, however, came to the opposite conclusion. It is "axiomatic

that an agency adjudication must either be consistent with prior adjudications or offer a reasoned basis for its departure from precedent." *ConAgra, Inc. v. NLRB,* 117 F.3d 1435, 1443 (D.C.Cir.1997) (internal citation omitted). The Board's decision in this case did neither. Accordingly, we vacate the Board's decision and remand the case for further proceedings.

### D. Counting the Sima Ballots

According to the NLRB's statement of procedures, "[c]ustomarily, the Board agents ... count and tabulate the ballots immediately after the closing of the polls. A complete tally of the ballots is made available to the parties upon the conclusion of the election." 29 C.F.R. § 101.19(a)(3). Likewise, the Board's rules and regulations state that "[u]pon the conclusion of the election the ballots will be counted and a tally of ballots prepared and immediately made available to the parties." 29 C.F.R. § 102.69(a). The NLRB's *Case Handling Manual for Representation Proceedings* echoes these rules, providing that "[t]he count should take place as soon after the close of voting as possible." § 11340.1 (Sept.1989 ed.).

In this case, following a request by the Union, the Regional Director decided to refrain from counting the Sima election ballots until after the completion of the multi-site election. He explained his decision by stating that "[t]o count the ballots in both units simultaneously guarantees that neither party will enjoy an unfair advantage over the other based on the result of the election in the Sima unit." The Director also noted that waiting to count the Sima ballots "fosters laboratory conditions for both elections."

After the elections, Katz filed an objection with the Regional Director, arguing that the decision to delay the Sima ballot count unreasonably deviated from normal

Board procedures. The Director overruled the objection for two reasons. First, he found that Katz had failed to submit evidence establishing that the delayed count materially affected the results of the elections. Supplemental Decision at 15. Second, he concluded that Katz did not proffer evidence to show that the Director's decision was an abuse of discretion. *Id.* at 15–16. The Board summarily affirmed this ruling. In its petition, Katz renews its claim.

■ The Board maintains "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946). Nevertheless, neither the Board nor the Regional Director may abuse that discretion. Indeed, if they choose to depart from usual election procedures, they must provide a reasoned explanation. *See Macmillan Publ'g Co. v. NLRB*, 194 F.3d 165, 168 (D.C.Cir. 1999).

■ Here, the Regional Director's only reason for departing from the normal procedure of counting the ballots and revealing the results "immediately" after the Sima election was that it might give one of the parties an "unfair advantage." Although the Board suggests that this casual conclusion is consistent with earlier election decisions, *see* Brief for the NLRB at 30 (citing *Diamond Walnut Growers, Inc.*, 308 N.L.R.B. 933 (1992); *Indep. Rice Mill, Inc.*, 111 N.L.R.B. 536 (1955)), it is not immediately apparent what is "unfair" about announcing the results of one election before another election commences— even when the two elections are closely related or include employees of the same company. Neither the Regional Director nor the Board offered any explanation. It is as if the Board has taken a page from the Bard: "For there is nothing either good or bad, but thinking makes it so." WILLIAM SHAKESPEARE, HAMLET act 2, sc. 2.

■ In its brief and at oral argument, the Board primarily stresses only one rationale for upholding the Regional Director's decision in this case: the Director has broad discretion. This misses the point. The Board (and in turn the Director) has received from Congress a delegation of authority to act in certain circumstances. *See Kwik Care Ltd. v. NLRB*, 82 F.3d 1122, 1126 (D.C.Cir.1996). When it acts, however, Congress requires it to act in a reasoned fashion, not arbitrarily and capriciously. *See BB&L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C.Cir.1995) (per curiam). If the Board cannot assign a reason for what it has done, then its actions are arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). That the Board has broad discretion is of no import. To state the standard of review is not to offer a reason. If the Board chooses to exercise its discretion, it must explain its action, and its explanation must reflect reasoned decisionmaking. *See Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 655 (D.C.Cir.1992). Just as simply stating that a procedure is "unfair" does not make it so, simply stating that the Director has broad discretion does not establish that he has exercised it properly.

Ultimately, to prevail, "a party attempting to set aside a representation election must demonstrate that the conduct complained of interfered with the employees' exercise of free choice to such an extent that it materially affected the election." *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 882 (D.C.Cir.1988). While the delay in tallying and releasing the results of the Sima vote might not itself be grounds for reversal, the Board's complete inability to explain how releasing the results prior to

the multi-site election could be "unfair" makes a remand appropriate.

### III. CONCLUSION

For the foregoing reasons, the petition for review is granted in part, and the cross-application for enforcement is denied.