**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0333n.06**
**Filed: May 10, 2006**

**Nos. 05-1432, 05-1609**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| COVENANT CARE OF OHIO, INC., | ) | |
| | ) | |
| Petitioner, | ) | O N   A P P E A L   F O R |
| | ) | ENFORCEMENT OF AN |
| v. | ) | ORDER OF THE NATIONAL |
| | ) | LABOR RELATIONS BOARD |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Respondent. | ) | |

**BEFORE:    BATCHELDER, CLAY, and McKEAGUE, Circuit Judges.**

**David W. McKeague, Circuit Judge.** Covenant Care of Ohio seeks review and the
National Labor Relations Board ("the Board") seeks enforcement of a Board decision finding a
violation of federal labor law and directing Covenant, the Employer, to bargain with the
International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM"). The Employer
argues that it should not be compelled to bargain with the union because the representation election
pursuant to which the union was certified must be set aside due to the union's objectionable
electioneering practices on the day of the election. For the following reasons, the panel denies the
Employer's petition for review and grants the Board's request for enforcement.

**I. BACKGROUND**

An election was conducted on July 20, 2004 among certain employees of Covenant Care of
Ohio to determine whether such employees desired to be represented by the International

Association of Machinists and Aerospace Workers, AFL-CIO ("IAM") for purposes of collective bargaining. The election was held during shift changes from 6:30 a.m. to 7:30 a.m. and from 2:30 p.m. to 3:30 p.m., in the employee break room located in the back of the Employer's facility. The pre-election conference took place at 6:00 a.m. that morning in the break room and was attended by representatives and election observers of both parties. At the pre-election conference, the Board agent established a no-electioneering area or zone including the polling area itself and the hallway area immediately outside of the break room. The observer witnesses for both parties stated that it was not possible to see outside of the break room through the windows because the blinds were closed, nor was it possible to hear anything that may have taken place outside on the sidewalk area in front of the Employer's facility.

The Employer's facility is a one-story square building with a square courtyard area in the middle. There is one driveway entrance leading into the Employer's parking lot, which is located in the front and to the left of the building if one is facing it from the street. There is a sidewalk that parallels the street in front of the facility. This sidewalk is about one to two hundred feet from the front entrance to the building. Around 6:30 a.m. on the morning of the election, seven individuals, including four union representatives and three non-employee volunteers, stationed themselves on the sidewalk in front of the Employer's facility, near the driveway which was the only entrance to the parking lot. The individuals had at least four signs with them. Each sign was about three feet by four feet and bore such slogans as "Vote Yes" and "Vote IAM." As vehicles entered and exited the Employer's facility through its driveway entrance, at least one of the union agents would approach the vehicles on the driver's side and attempt to offer the occupant a four-page flyer

containing the names of twenty-seven unit employees who purportedly expressed that they intended to vote for the union at the election.

Shortly after 6:30 a.m., the Employer's counsel approached the union representatives on the sidewalk and asked them to vacate the premises. They declined, maintaining that they had a statutory right to be there. The Employer then called the police because it believed that the union agents were creating a traffic hazard. At approximately 6:45 a.m., three police cruisers from the city of Fairborn, Ohio arrived at the Employer's facility. The police officers stayed for about fifteen minutes and then left after advising both parties that the sidewalk was public property and that the union agents could remain, but advising them to not prevent people from entering or leaving the facility. The union agents left the sidewalk area at around 7:30 a.m. They returned for the second polling session from around 2:30 p.m. until 3:30 p.m., at which time they left to attend the ballot count. They engaged in the same handbilling activity during the second polling session as during the morning session.

Out of approximately forty-six eligible voters, twenty-seven votes were cast for the union, eleven votes were cast against the union, and five ballots were challenged. The Employer filed timely objections to the election. Specifically, it alleged that the election must be overturned because (1) the union engaged in unlawful electioneering by assembling on the sidewalk at the driveway entrance to the facility, picketing, carrying signs, and distributing literature to arriving employees; and (2) the union failed to provide the notice of intent to picket required by § 8(g) of the National Labor Relations Act ("NLRA"). 28 U.S.C. § 158(g). On September 15, 2004, the Regional Director issued a report on the objections and recommended that the Board overrule the

Employer's objections because they failed to raise any substantial or material issues affecting the

results of the election. The Board adopted the findings and recommendations in the Regional

Director's report and certified the union as the exclusive bargaining representative.

The Employer refused to bargain with the union. The union filed an unfair labor practice

charge based on the Employer's refusal to bargain. The Employer admitted that it had refused to

bargain with the union, but claimed that the union was improperly certified. Since the Employer did

not present any new arguments or evidence other than what was presented in support of its election

objections in the representation proceeding, the Board rejected its arguments, found that the

Employer had violated Section 8(a)(5) and (1) of the NLRA, and ordered the Employer to bargain

with the union upon request. The Employer timely appealed this ruling.

## II. ANALYSIS

### A.

Congress has vested the NLRB with significant discretion to supervise and regulate

representation elections. *Maremont Corp. v. NLRB*, 177 F.3d 573, 576 (6th Cir. 1999). To ensure

that employees maintain the greatest access to choice in the selection of their representatives, the

NLRB is "to conduct representation elections 'in an atmosphere in which employees are free from

pressure, coercion and undue influence from either the employer or the union.'" *Id.* at 577 (quoting

*NLRB v. Tennessee Packers, Inc.*, 379 F.2d 172, 180 (6th Cir. 1967)). The burden of demonstrating

that a representation election was not conducted fairly rests with the party seeking to overturn the

results. *NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1180 (6th Cir.1988). To satisfy this

burden, the objecting party must demonstrate that "unlawful conduct occurred which interfered with

employees' exercise of free choice to such an extent that it materially affected the results of the election." *Comcast Cablevision Taylor v. NLRB*, 232 F.3d 490, 494 (6th Cir. 2000) (citing *NLRB v. Shrader's, Inc.*, 928 F.2d 194, 196 (6th Cir. 1991)).

The Board's legal conclusions are reviewed de novo. *NLRB v. Good Shepherd Home, Inc.*, 145 F.3d 814, 816 (6th Cir. 1998). This Court reviews the Board's factual findings and application of the NLRA to the particular facts of a case under a substantial evidence standard. *Id*. The Board's findings with respect to whether an election reflected the "fair and free choice" of employees "will not be disturbed on appeal where substantial evidence in the record as a whole supports its conclusions." *NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 285 (6th Cir.1998); *Comcast Cablevision-Taylor*, 232 F.3d at 495. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## B.

The Employer's first argument is that the Board applied the wrong legal standard when evaluating whether the union's conduct required the election to be set aside. The Employer points out that the proper legal standard is that an election must be set aside if the objectionable conduct "reasonably tends to interfere with the employees' free and uncoerced choice in the election." *Baja's Place*, 268 NLRB 868, 868 (1984). The Board clearly recognized this legal standard. (JA 26.) ("It is well established that in order for a party's conduct to constitute grounds for setting aside an election, the conduct at issue must reasonably tend to interfere with the employees' free and uncoerced choice in the election.") However, the Employer contends that although the Board cited

the correct legal standard, it actually applied a different, incorrect, standard. The Board found that "the evidence fails to establish that the Petitioner's electioneering activity interfered with employee free choice in the election." (JA 25). According to the Employer, this statement indicates that the Board was applying a legal standard which required a showing of actual coercion instead of a reasonable tendency to coerce.

The Sixth Circuit has remanded cases to the Board where the Board has erroneously required a showing of actual coercion or interference in order to overturn a representation election. *Harborside Healthcare v. NLRB*, 230 F.3d 206, 214 (6th Cir. 2000); *Evergreen Healthcare v. NLRB*, 104 F.3d 867, 878-79 (6th Cir. 1997). Such a remand is not necessary here because the Board did not make that mistake in this case. The Board did observe that there was no evidence that the conduct at issue interfered with the employees' free choice. However, in the very next paragraph, the Board went on to explicitly state the correct legal standard. Only after setting forth the correct standard did the Board reach the final conclusion that the Employer had failed to carry its burden of proof that the election should be set aside. Moreover, the Board extensively discussed and evaluated the factors set forth in the *Boston Insulated* case. (JA 24-25) (citing *Boston Insulated Wire & Cable*, 259 NLRB 1118, 1118-19 (1982)). The *Boston Insulated* factors are used in evaluating allegations of objectionable electioneering in order "to determine whether the conduct reasonably tended to interfere with employee free choice." *Pearson Education*, 336 NLRB 979, 979 (2001). The Board applied the correct legal standard both implicitly and explicitly.

C.

The Employer goes on to argue that the nature of the union's conduct on the day of the election constituted objectionable electioneering sufficient to require setting aside the results of the election. The Employer argues both that the picketing constituted per se objectionable conduct and, alternatively, that it interfered with employees' free choice in the election. The union counters that there is no basis to overturn the Board's ruling upholding the election results.

The Board has held that "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations." *Milchem, Inc*., 170 NLRB 362, 362 (1968). Any violation of the *Milchem* rule requires that an election be set aside. *Id*. Where impermissible electioneering is alleged, but the *Milchem* rule is not implicated, "the Board makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election." *Dayton Hudson Dept. Store v. NLRB*, 987 F.2d 359, 364 (6th Cir. 1993). This determination involves a number of factors, including the proximity of the conduct to the polling place, the extent and nature of the electioneering, whether the electioneering was conducted within a designated "no electioneering" area, and whether the electioneering was otherwise in violation of the instructions of the Board agent in charge of the election. *Boston Insulated Wire & Cable Co.*, 259 NLRB 1118, 1119 (1982).[1]

---

[1]The Employer does not clarify which standard should be applied in this case, but cites cases involving both. Therefore, the Board's determination will be evaluated in light of each standard in turn.

The Employer contends that electioneering near the polls at a location voters must pass in order to vote violates the *Milchem* rule. However, the Board points out that the *Milchem* rule has been consistently applied only to conversations between a party agent and voters that took place either in the polling area or with voters actually waiting in line to cast their ballots. *See Dayton Hudson Dept. Store v. NLRB*, 987 F.2d 359, 364 (6th Cir. 1993) ("Where the conversation is not prolonged, and where it does not involve party representatives' conversing with voters waiting in line to vote or in the actual polling area, *Milchem* is inapplicable.") All of the cases cited by the Employer applying the *Milchem* rule involved conversations between a party agent and voters who were either in the polling area or actually waiting in line to vote. *See NLRB v. Carroll Contracting and Ready Mix, Inc.*, 636 F.2d 111, 112-13 (5th Cir. 1981) (finding the *Milchem* rule violated where electioneering activity outside polling place included speaking with employees waiting in line to vote); *Midwest Stock Exchange, Inc. v. NLRB*, 620 F.2d 629, 633-34 (7th Cir. 1980) (finding the *Milchem* rule violated based on a five-minute conversation between a party agent and an employee waiting in line to vote); *Bio-Medical Applications*, 269 NLRB 827, 829 (1984) (finding the *Milchem* rule violated where party agent spoke with four employees in the waiting room adjacent to the polling area). None of these cases supports the proposition that the *Milchem* rule extends any farther than the voters actually waiting in line to vote.[2] Moreover, there are cases which specifically hold

---

[2]The Employer asserts that *Midwest Stock Exchange* supports such an argument because a *Milchem* rule violation was found based on a union agent's impermissible conversation with employees in the "line of march" to the polling place. However, although the employer in that case argued that such conduct had occurred and required overturning the election, the court never reached that issue. *Midwest Stock Exchange*, 620 F.2d at 632, 633-34. Since the union agent had engaged in a clearly improper conversation with an employee waiting in line to vote, the court overturned

that electioneering activity near the polls, but not directed at employees actually waiting in line, does not violate the *Milchem* rule. *NLRB v. J.P. Transportation, Co.*, 1998 WL 869984 (6th Cir. 1998) (unpublished) (holding that speaking to employees in a parking lot near the polling place while the polls were open did not violate the *Milchem* rule); *NLRB v. Del Rey Tortilleria, Inc*., 823 F.2d 1135, 1140 (7th Cir. 1987) (holding that electioneering approximately fifty feet from entrance to building did not violate the *Milchem* rule where those waiting in line to vote were inside the building while the polls were open).

Since the *Milchem* rule does not apply, the representation election must only be overturned if "the electioneering substantially impaired the exercise of free choice." *Nathan Katz Realty v. NLRB*, 251 F.3d 981, 991 (D.C. Cir. 2001). The Employer asserts that electioneering near the polls in a location employees must pass in order to vote necessarily impairs employees' free choice. *Citing Nathan Katz*, 251 F.3d at 992-93; *Electric Hose & Rubber Co.*, 262 NLRB 186, 216 (1982); *Star Expansion Industries*, 170 NLRB 364, 365 (1968); *Performance Measurements Co.,* 148 NLRB 1657, 1659 (1964); *Detroit Creamery*, 60 NLRB 178, 180 (1945). Two of the cited cases held that the continuous unexplained presence of a party agent at a location employees must pass in order to vote is coercive and interferes with employees' freedom of choice. *Electric Hose*, 262 NLRB at 216; *Performance Measurements*, 148 NLRB at 1659. Both of those cases involved a party agent's continued unexplained presence within fifteen feet of the entrance to the polling room. The remaining cases the Employer cited overturned elections based on both the proximity of

---

the election on that basis and never addressed the argument that the conversation with a voter in the "line of march" to the polling place violated the *Milchem* rule. *Id*. at 633-34.

electioneering activity to the polling place and the fact that the conduct occurred within a designated no-electioneering zone and contrary to a Board agent's direct instructions. *Nathan Katz*, 251 F.3d at 992-93; *Star Expansion Industries*, 170 NLRB at 365; *Detroit Creamery*, 60 NLRB at 180.

The cases the Employer cites do show that electioneering near a polling place can interfere with employees' free choice under certain conditions. Nevertheless, under some circumstances the Board has determined that electioneering in the vicinity of a polling place has *not* interfered with employees' free choice. *Boston Insulated Wire & Cable v. NLRB*, 703 F.2d 876, 882 (5th Cir. 1983) (refusing to set aside election results where electioneering was conducted directly outside entrance to building but not in a no-electioneering zone or contrary to the instructions of the Board agent); *J.P. Transportation*, 1998 WL 869984 (holding that party agents' conversation with arriving voters in parking lot outside of polling place did "not appear substantially to have impaired the employees' free choice in the election"); *Chrill Care, Inc.*, 340 NLRB No. 123 (2003) (refusing to set aside election where union representatives picketed outside of employer's premises during election). The Board considered the relevant case law and concluded that the facts in this case are more similar to the line of cases which have found that electioneering conduct did not interfere with employees' free choice. The Board distinguishes *Nathan Katz*, *Star Expansion*, and *Detroit Creamery* on the basis that those cases involved electioneering conduct within the designated no-electioneering zone and contrary to the Board agent's instructions. The Employer points out that the extent of a no-electioneering zone can vary widely depending on the individual Board agent and argues that because of such vagaries the Board should not have considered the fact that the electioneering at issue did not take place within the no-electioneering zone. This argument is unpersuasive because

the case law repeatedly states that the no-electioneering zone is a legitimate factor to consider. *See, e.g., Nathan Katz*, 251 F.3d at 991 (factors to consider include "whether [the electioneering] happened within a designated 'no electioneering' area"); *Boston Insulated Wire & Cable Co.*, 259 NLRB at 1119 (factors to consider include "whether the electioneering is conducted within a designated 'no electioneering' area").

The Board distinguishes *Performance Measurements* and *Electric Hose* on the basis that they involved a party agent's continued presence within fifteen feet of the entrance to the polling area. Although those cases contain language generally stating that a party agent's presence at a place where employees must pass in order to vote is coercive, the Board implicitly limited the application of that statement to the particular factual situation under consideration, i.e. voters being subjected to their supervisors' scrutiny immediately before entering the polling area. The Board does not deny that the electioneering in this case took place at the only entrance to the Employer's parking lot. Instead, the Board points to the factually similar cases which have upheld elections. *See Boston Insulated Wire & Cable v. NLRB*, 703 F.2d 876, 882 (5th Cir. 1983) (refusing to set aside election results where electioneering was conducted directly outside the two entrances to the building but not in a no-electioneering zone or contrary to the instructions of the Board agent); *Chrill Care, Inc.*, 340 NLRB No. 123 (2003) (refusing to set aside election where union representatives picketed outside of employer's premises during election); *see also J.P. Transportation*, 1998 WL 869984 (holding that party agents' conversation with arriving voters in parking lot outside of polling place did "not appear substantially to have impaired the employees' free choice in the election").

This circuit has recognized that "[t]he question whether there is interference with the employees' freedom of choice is often subtle and difficult." *NLRB v. Gilmore, Indus.*, 341 F.2d 240, 241-42 (6th Cir. 1965). On appeal we afford the Board "broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union." *NLRB v. Duriron Co.*, 978 F.2d 254, 256-57 (6th Cir. 1992). The Supreme Court has held that courts "must respect the judgment of the agency empowered to apply the law to varying fact patterns, even if the issue with nearly equal reason might be resolved one way rather than another." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996). Here the Board chose to follow the cases addressing electioneering activity conducted outside of the building where polling was taking place and outside of the no-electioneering zone, instead of the cases addressing party agents stationed almost directly outside the actual polling area. This is a reasonable legal interpretation.

## D.

The Employer's final argument is that the union's conduct on the day of the election violated Section 8(g) of the NLRA and that violation of the NLRA is, *a fortiori*, conduct which interferes with an election. Section 8(g) requires a union to give notice ten days prior to picketing at a health care institution such as the Employer. 29 U.S.C. § 158(g).[3] The union acknowledges that it did not give notice, but argues that its activities did not constitute picketing. The Board assumed for the

---

[3]The purpose of Section 8(g) is to allow for notice to health care facilities in advance of a strike or picketing so they will be able to arrange for continuity of care for their patients. 1974 U.S.C.C.A.N. 3946, 3949 (1974).

sake of argument that the union did violate Section 8(g), but determined that such a violation does

not constitute a  per se grounds for setting aside an election.  We also assume for the sake of

argument that a Section 8(g) violation occurred.

The cases relied upon by the Employer state that "[a] violation of Section 8(a)(1) found to

have occurred during the critical election period is, a fortiori, conduct which interferes with the

results of the election unless it is so de minimis that it is 'virtually impossible to conclude that [the

violation] could have affected the results of the election.'" *Airstream, Inc*., 304 NLRB 151, 152

(1991) (quoting *Enola Super Thrift*, 233 NLRB 409, 409 (1977)).  The Employer argues that this

principle extends to every violation of the NLRA, not just violations of Section 8(a)(1).  However,

none of the cases addressing violations of other provisions, including Section 8(g), have treated such

violations as inherently interfering with an election.  *See Regent Assisted Living v. NLRB*, No. 05-

1185, 2006 U.S. App. LEXIS 5601 (D.C. Cir. Mar. 2, 2006) (rejecting the argument that all NLRA

violations, *a fortiori*, interfere with elections); *ARA Living Centers*, 300 NLRB 888, 888 (1990)

(holding that Section 8(g) "has no significant connection with the restraint and coercion of

employees"); *Holt Bros*., 146 NLRB 383, 384 (1964) (observing that a Section 8(e) violation does

"not necessarily restrain or coerce employees and thus prevent a fair election").  In light of this

authority, the Board's conclusion that a Section 8(g) violation is not a per se grounds for setting

aside a representation election was correct.[4]

_____

[4]Even if the Employer was correct that any violation of the NLRA which takes place during
an election is, *a fortiori*, conduct which interferes with the election, the Section 8(g) violation in this
case would still not be sufficient to require overturning the election.  The rule the Employer relies
upon clearly states that an election is not overturned where the statutory violation is "so de minimis

## III. CONCLUSION

For the foregoing reasons, we DENY the Employer's petition for review and grant the

Board's cross-application to ENFORCE its order.

---

that it is virtually impossible to conclude that [the violation] could have affected the results of the election." *Airstream, Inc*., 304 NLRB at 152. The Employer argues that the union's violation of Section 8(g) was not a *de minimis* violation because there is no way to reasonably conclude that it was virtually impossible that the union picketing could have affected the outcome of the election. However, the violation of the NLRA was not the picketing activity, but the failure to give notice of that activity. The Employer does not claim that any of the employees were aware of the failure to give notice at the time they voted. If no employees were aware of the action–or inaction–which violated of the NLRA, that violation could not have interfered with the election.